[No. A129146. First Dist., Div. Five. Mar. 5, 2012.]

ASAHI KASEI PHARMA CORPORATION, Plaintiff and Appellant, v. COTHERIX, INC., Defendant and Respondent.

## COUNSEL

Morgan, Lewis & Bockius, Franklin B. Gowdy, Thomas M. Peterson, Benjamin P. Smith, Christopher J. Banks and Matthew J. Poole for Plaintiff and Appellant.

Cotchett, Pitre & McCarthy, Nancy L. Fineman, Nanci E. Nishimura; Baker Botts, Aaron Streett, Michele A. Gustafson; Ropers, Majeski, Kohn & Bentley, Susan H. Handelman; Bingham McCutchen, James B. Lewis; Mayer Brown, Lee N. Abrams; and Michael D. Liberty for Defendant and Respondent.

## OPINION

**BRUINIERS, J.**—A company lawfully acquires a competitor. Can the activities of the two companies in anticipation of the merger constitute a conspiracy in restraint of trade under the Cartwright Act, the California antitrust statute (Bus. & Prof. Code, § 16700 et seq.)?[1] Appellant Asahi Kasei Pharma Corporation (Asahi) sued respondent CoTherix, Inc. (CoTherix), alleging that Asahi suffered damage from such a conspiracy between CoTherix and its now

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

parent company, Actelion Ltd. (Actelion). The trial court, relying on the opinion of our Supreme Court in *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147 [252 Cal.Rptr. 221, 762 P.2d 385] (*Texaco*), held that the Cartwright Act has no application in these circumstances and granted summary adjudication in favor of CoTherix.[2] Asahi claims this was error. We affirm.

## I. BACKGROUND

Asahi is a Japanese corporation which develops and markets pharmaceutical products and medical devices. One of its products is Fasudil, a Rho-kinase[3] inhibitor which Asahi sought to market for treatment of pulmonary arterial hypertension (PAH).[4] PAH is a chronic, progressive and often fatal disease, which is characterized by severe constriction and obstruction of the pulmonary arteries.

In order to market Fasudil in the United States (U.S.) for treatment of PAH, Asahi, on June 23, 2006, entered into a licensing agreement (the Licensing Agreement) with CoTherix, a California-based biopharmaceutical company focused on developing and commercializing products for the treatment of cardiovascular disease. CoTherix had previously obtained regulatory approval for its own inhaled PAH treatment drug, Ventavis. Under the terms of the Licensing Agreement, CoTherix agreed to obtain regulatory approvals for Fasudil, and to develop and commercialize it in North America and Europe. CoTherix was to develop oral and inhaled formulations of Fasudil for treatment of PAH, and an oral formulation of Fasudil for treatment of stable angina. It was required to use commercially reasonable efforts to develop Fasudil, and to obtain U.S. regulatory approvals for Fasudil as soon as reasonably practicable.

---

[2] Asahi's third amended complaint alleged three causes of action against CoTherix for violation of California's Cartwright Act, false advertising law (§ 17500 et seq.), and unfair competition law (§ 17200 et seq.). On December 21, 2009, Judge Carol L. Mittlesteadt granted summary adjudication of the Cartwright Act claim as to CoTherix. On March 4, 2010, Asahi voluntarily dismissed its false advertising claim. On May 21, 2010, Judge Marie S. Weiner granted summary adjudication of the unfair competition law claim. A final judgment was accordingly entered by Judge Weiner in favor of CoTherix on July 8, 2010.

[3] Rho-kinase is a protein contributing to constriction in the smooth muscle in arterial blood vessels (vasoconstriction).

[4] Fasudil was originally formulated in 1984 for intravenous use in treatment of cerebral vasospasm after subarachnoid hemorrhage (a type of stroke), and received regulatory approval in Japan for this use. Asahi asserts that Fasudil also has additional potential uses beyond PAH treatment, including treatment of stable angina, arteriosclerosis, and other diseases or conditions in which Rho-kinase may be involved.

Actelion is a Swiss pharmaceutical company. Actelion Pharmaceuticals US, Inc., is a U.S.-based operational subsidiary of Actelion (through an intermediate subsidiary). Actelion has, since December 2001, marketed the drug Tracleer (bosentan), an endothelin receptor antagonist in the form of an orally ingested tablet which is also used in the treatment of PAH, and which has been approved by the Food and Drug Administration for use in the U.S. Tracleer is what is known in the pharmaceutical industry as a "blockbuster" drug, generating over $1 billion in revenue annually, and Actelion has held the dominant share of the relevant market. In 2006, 98 percent of Actelion's U.S. revenues were dependent upon Tracleer sales.

On January 9, 2007, Actelion, through an intermediate subsidiary, acquired all of the stock of CoTherix, pursuant to a tender offer under a November 19, 2006 "Agreement and Plan of Merger" (the Acquisition Agreement). Actelion concurrently notified Asahi that it was discontinuing development of Fasudil for "business and commercial reasons."

On November 19, 2008, Asahi filed suit against CoTherix and Actelion.[5] Among other claims, Asahi alleged that CoTherix and Actelion violated the Cartwright Act by forming a "combination" by "conspir[ing] together, pre-acquisition, . . . to mislead Asahi about Actelion's . . . intentions [to discontinue the development of] Fasudil," which Actelion allegedly viewed as a potential competitor to Tracleer.

Asahi contends that Actelion was concerned about immediate threats to its Tracleer market share from the launch of competing products and feared that Fasudil would compete directly with Tracleer, causing potential pricing issues which would cost Actelion hundreds of millions of dollars in lost net revenue. Therefore, Asahi asserts, one of Actelion's goals in acquisition of CoTherix was to terminate the development of Fasudil. In pursuit of this goal, Actelion purportedly directed CoTherix Chief Executive Officer Don Santel to falsely reassure Asahi, after the CoTherix acquisition was announced, that "CoTherix continues to operate in the ordinary course of business, which includes the development of Fasudil." In reality, according to Asahi, Actelion never had any intention of permitting CoTherix to continue development of Fasudil, and CoTherix began halting and delaying work on Fasudil's development prior to close of the acquisition. Had it known the true facts, Asahi insists that it would have pursued contractual remedies against CoTherix and could have sued for injunctive relief under the Licensing Agreement, thereby delaying or

---

[5] Also named as defendants were Actelion Pharmaceuticals Ltd., Actelion Pharmaceuticals US, Inc., Actelion U.S. Holding Company, and Actelion officers Jean-Paul Clozel, Martine Clozel, and Simon Buckingham. They are not parties to this appeal.

aborting Actelion's planned acquisition. Thus, Asahi charges, Actelion conspired with CoTherix "for anticompetitive purposes to eliminate an upstart competitor in the relevant market for PAH treatments."

On August 18, 2009, CoTherix and the other U.S. subsidiaries of Actelion (Actelion U.S. Holding Company, Actelion Pharmaceuticals US, Inc.) filed a motion for summary adjudication challenging, inter alia, Asahi's Cartwright Act claim. CoTherix argued that the Cartwright Act is inapplicable to corporate acquisition transactions; that there were no triable issues of material fact as to whether CoTherix and Actelion had conspired to interrupt the development of Fasudil; and that Asahi lacked antitrust standing.

On December 22, 2009, the trial court entered its order granting summary adjudication of Asahi's Cartwright Act claim as to CoTherix and the other U.S. subsidiaries of Actelion.[6] The court, citing *Texaco, supra*, 46 Cal.3d at page 1168, found that "Defendants have met their initial burden under [Code of Civil Procedure section] 437c[, subdivision] (p)(2) of showing that this cause of action has no merit because the Cartwright Act does not apply to a merger . . . and the complaint does not allege any pre-merger violation of the Cartwright Act." The court found that the third amended complaint alleged only unilateral intent by Actelion to eliminate Fasudil as a competitor to Actelion's products, and that Asahi's allegations that CoTherix and Actelion conspired to prevent Asahi from pursuing its contractual remedies against CoTherix under the Licensing Agreement "do not state a Cartwright Act violation because they do not constitute allegations of a combination of capital, skill or acts by two or more persons for the purpose of restraining competition . . . ."

On March 19, 2010, defendants moved for summary adjudication of Asahi's seventh claim for violation of the unfair competition law. On May 21, 2010, the trial court granted the motion as to CoTherix.[7] That order disposed of all causes of action against CoTherix[8] and, accordingly, judgment was entered in CoTherix's favor on July 8, 2010. A timely notice of appeal was filed on July 21, 2010.

---

[6] Asahi's Cartwright Act claims against the other individual and corporate defendants were subsequently, and separately, summarily adjudicated in their favor.

[7] Asahi acknowledges that its Cartwright Act claims constituted the predicate unlawful conduct on which its unfair practices claims were based.

[8] Asahi voluntarily dismissed its false advertising claim on March 4, 2010.

## II. DISCUSSION

### A. *Standard of Review*

A motion for summary judgment or summary adjudication is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review an order granting or denying a motion for summary adjudication de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) In our review, we are required to liberally construe, and draw all reasonable inferences from, the evidence in favor of the party opposing the motion. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460, 470 [30 Cal.Rptr.3d 797, 115 P.3d 77].) We strictly scrutinize a defendant's showing. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "In applying this exacting standard of review, we are also mindful that both California and federal decisions urge caution in granting a defendant's motion for summary judgment in an antitrust case." (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 321 [7 Cal.Rptr.3d 628].) Nevertheless, "summary judgment is available, and always remains available, even in complex cases," including antitrust actions for an unlawful conspiracy under the Cartwright Act. (*Aguilar*, at pp. 860–861.) "If a party moving for summary judgment in any action, including an antitrust action for unlawful conspiracy, would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment." (*Id.* at p. 855.)

### B. *The Cartwright Act*

In 1907, the California Legislature enacted the Cartwright Act[9] which " 'generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices.' [Citation.]" (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1147 [69 Cal.Rptr.2d 329, 947 P.2d 291]; see *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 23 [144 Cal.Rptr. 664].)

The focus of the Cartwright Act is "on the punishment of violators for the larger purpose of promoting free competition. (See Stats. 1907, ch. 530, p. 984

---

[9] Section 16720 provides in relevant part: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: [¶] (a) To create or carry out restrictions in trade or commerce. [¶] . . . [¶] (c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity." Section 16726 provides: "Except as provided in this chapter, every trust is unlawful, against public policy and void."

[the Cartwright Act is 'An act to define trust and to provide for criminal penalties and civil damages, and punishment of [entities connected with trusts], and to promote free competition in commerce and all classes of business in this state'].)" (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 783 [111 Cal.Rptr.3d 666, 233 P.3d 1066].) A successful plaintiff can recover treble damages. (§ 16750, subd. (a).)

A Cartwright Act violation requires "a combination of capital, skill or acts by two or more persons" that seeks to achieve an anticompetitive end. (§ 16720; see Antitrust and Unfair Competition Law Section, State Bar, Cal. State Antitrust and Unfair Competition Law (2009) § 2.02[D], p. 40 (hereafter, Cal. Antitrust & Unfair Competition).) Consequently, "[o]nly separate entities pursuing separate economic interests can conspire within the proscription of the antitrust laws against price fixing combinations." (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 189 [91 Cal.Rptr.2d 534] (*Freeman*), citing *Copperweld Corp. v. Independence Tube Corp.* (1984) 467 U.S. 752, 769–771 [81 L.Ed.2d 628, 104 S.Ct. 2731] (*Copperweld*) [discussing application of the federal Sherman Act].)

As we discuss further *post*, federal antitrust laws prohibit anticompetitive mergers. (See 15 U.S.C. §§ 1, 2 (Sherman Act); 15 U.S.C. § 18 (Clayton Act).) A merger is illegal under section 1 of the Sherman Act if it effects an unreasonable restraint of trade, while section 2 of the Sherman Act prohibits monopolies. (See *Alaska Airlines v. United Airlines, Inc.* (9th Cir. 1991) 948 F.2d 536, 540–541 [each Sherman Act section "focus[es] on different problems": "concerted conduct is subject to sanction [under § 1] if it merely restrains trade, unilateral conduct is subject to sanction [under § 2] only if it either actually monopolizes or threatens monopolization"].) A merger may be attacked under the Clayton Act if it has the potential to substantially lessen competition. (*Texaco, supra*, 46 Cal.3d at p. 1165, fn. 18.)

"[T]he Cartwright Act is not derived from the Sherman Act, but rather from the laws of other states, and the Cartwright Act and the Sherman Act differ in wording and scope." (Cal. Antitrust & Unfair Competition, *supra*, § 1.05, p. 24.) The Cartwright Act bans combinations, but single firm monopolization is not cognizable under the Cartwright Act. (*Texaco, supra*, 46 Cal.3d at p. 1163; *Freeman, supra*, 77 Cal.App.4th at p. 200, fn. 32; but cf. *Lowell v. Mother's Cake & Cookie Co., supra*, 79 Cal.App.3d at p. 23 [holding that "monopoly is a prohibited restraint of trade" under the Cartwright Act].) To maintain an action for a combination in restraint of trade under the Cartwright Act, "the following elements must be established: (1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts. [Citation.]" (*Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 718 [187 Cal.Rptr. 797].)

## C. *Texaco*

In *Texaco*, the Attorney General contended that a proposed acquisition by Texaco of the assets of Getty Oil Company through merger was anticompetitive and sued under the Cartwright Act seeking to enjoin the merger.[10] (*Texaco, supra*, 46 Cal.3d at pp. 1150–1151.) The trial court sustained Texaco's demurrer without leave to amend and dismissed the complaint. Affirming, our Supreme Court extensively examined the historical antecedents of the Cartwright Act, and concluded that our Legislature had implemented the Cartwright Act intending to adopt the meaning of "combination" as used, and as judicially interpreted, in the 1889 Texas and 1899 Michigan legislation upon which the Cartwright Act was modeled, i.e., anticompetitive collusion between otherwise independent and competing entities. (*Texaco*, at pp. 1162–1163.) The court particularly noted the Legislature's failure to adopt antimerger and antimonopoly provisions included in then recently amended antitrust legislation in other jurisdictions, and its failure to do so since, despite at least 26 other amendments subsequent to enactment in 1907. (*Id.* at pp. 1159–1163.)[11] "Given this history, we must conclude that the drafters intended that their Act apply, as its words had been construed, only to entities that 'combine,' in the sense of those who *perdure* (i.e., continue as separate, independent, competing entities during and after their collusive action)—and therefore that the drafters did not intend the Cartwright Act to regulate the bona fide purchase and sale of one firm by another."[12] (*Texaco*, at p. 1163.) The court held that the provisions of the Cartwright Act could not be used to challenge mergers and acquisitions and found that "the drafters of the Cartwright Act intended to make their law applicable only to situations in which the parties improperly collude *and continue as separate, independent entities*, and not to situations in which, by virtue of purchase and sale, or merger, one or more of the entities ceases to exist." (*Texaco*, at p. 1167, some italics added.) In a bona fide merger "the entities lose forever their separate identities, and become a new, independent entity." (*Id.* at pp. 1152–1153.)

---

[10] The Attorney General also alleged that the merger violated the Unfair Practices Act (§ 17000 et seq.). (*Texaco, supra*, 46 Cal.3d at pp. 1150–1151.)

[11] Since *Texaco* was decided, there have been three unsuccessful legislative attempts to provide a private damage cause of action for unilateral monopolization. (Cal. Antitrust & Unfair Competition, *supra*, § 6.01[B], pp. 187–188 [discussing Assem. Bill No. 671 (1989–1990 Reg. Sess.); Sen. Bill No. 1814 (2001–2002 Reg. Sess.); Sen. Bill No. 1274 (2005–2006 Reg. Sess.)].) Senate Bill No. 1274 was described as "an attempt to 'harmonize California antitrust law with § 2 of the federal Sherman Act' because California antitrust statutes 'lack an analogous provision specifically prohibiting monopolization or attempted monopolization.' " (Cal. Antitrust & Unfair Competition, *supra*, § 6.01[B], p. 188, fn. omitted.)

[12] The court held that the Unfair Practices Act was likewise inapplicable. (*Texaco, supra*, 46 Cal.3d at p. 1170.) This holding has been superseded by statute. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

D. *Copperweld*

Also relevant to our discussion is the determination by the Supreme Court that the coordinated acts of a parent and its wholly owned subsidiary do not constitute a combination or conspiracy under section 1 of the Sherman Act. (*Copperweld, supra*, 467 U.S. at p. 777.) Rejecting prior cases suggesting the possibility of "intra-enterprise" liability in this context, the Supreme Court held that "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny." (*Id.* at pp. 772, 771; see also *American Needle, Inc. v. National Football League* (2010) 560 U.S. ___, ___ [176 L.Ed.2d 947, 130 S.Ct. 2201, 2212] (*American Needle*).)

The Supreme Court acknowledged that the focus of section 1 of the Sherman Act on concerted behavior "leaves a 'gap' in the Act's proscription against unreasonable restraints of trade. . . . An unreasonable restraint of trade may be effected not only by two independent firms acting in concert; a single firm may restrain trade to precisely the same extent if it alone possesses the combined market power of those same two firms. Because the Sherman Act does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct . . . that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." (*Copperweld, supra*, 467 U.S. at pp. 774–775, citation omitted.)

Our own Supreme Court has not yet directly addressed the application and scope of *Copperweld* to the Cartwright Act. At least one appellate district has applied *Copperweld* in rejecting a Cartwright Act price-fixing claim brought against a corporate real estate multiple listing service and its local real estate association shareholders. (*Freeman, supra*, 77 Cal.App.4th 171; see also *Eddins v. Redstone* (2005) 134 Cal.App.4th 290, 341–343 [35 Cal.Rptr.3d 863] [applying *Copperweld* in sustaining summary adjudication of a claim of collusion under the Unfair Practices Act between commonly controlled companies]; *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 255–256 [106 Cal.Rptr.3d 46] [applying *Copperweld* principles to claim

under the unfair competition law]; cf. *MacManus v A. E. Realty Partners* (1987) 195 Cal.App.3d 1106, 1112 & fn. 4 [241 Cal.Rptr. 315] [distinguishing *Copperweld* and declining to decide application under the Cartwright Act to a purely intra-enterprise conspiracy or combination].) In another instance, the federal district court for the Central District of California dismissed a Cartwright Act conspiracy claim against a manufacturer and its wholly owned subsidiaries, finding that *Copperweld* would "likely . . . be persuasive to the Supreme Court of California." (*Newport Components v. NEC Home Electronics* (C.D.Cal. 1987) 671 F.Supp. 1525, 1544, 1550.)[13]

Absent contrary direction from our Supreme Court, we believe that the rationale of *Copperweld* is entirely consistent with the approach of *Texaco*, and the established teaching of our own cases that an indispensable element of any action under the Cartwright Act is proof of a " 'combination of resources of two or more *independent interests* for the purpose of restraining commerce and preventing market competition . . . .' [Citation.]" (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 266 [195 Cal.Rptr. 211], italics added.)

E. *Application of* Texaco

The trial court, in granting summary adjudication, found *Texaco* controlling. Asahi, acknowledging the continuing vitality of *Texaco* in the context of corporate mergers, seeks to narrowly interpret its scope and contends that *Texaco* has no application to premerger activities during the period that the acquired and acquiring entities maintain separate identities. We find the distinctions that Asahi attempts to draw unpersuasive.

Asahi argues that, unlike the Attorney General in *Texaco*, it does not seek to challenge the Actelion/CoTherix merger, but instead targets an anticompetitive premerger combination or conspiracy resulting when "CoTherix and its executives . . . joined with Actelion to frustrate Asahi's rights under the [Licensing] Agreement so that the path would be clear for Actelion to prevent a vibrant competitive offering in the markets for PAH and [stable angina] treatments."

1. *The Licensing Agreement*

Asahi's theory of the case is premised on provisions of the Licensing Agreement anticipating potential change in control of CoTherix. Section 11.2(f) of the Licensing Agreement permitted Asahi to terminate the agreement in the event that CoTherix was acquired by a "Competitive Company,"

---

[13] As we discuss *post*, judicial interpretation of the Sherman Act, while often helpful, is not dispositive on Cartwright Act issues. (*Texaco, supra*, 46 Cal.3d at p. 1164.)

defined as "any Third Party . . . that conduct[s] Development or Commercialization of a Pulmonary Hypertension drug or Stable Angina drug . . . ." In that event, the Competitive Company was required to assume CoTherix's development obligations under the Licensing Agreement and provide written confirmation of its agreement to do so. Failure to do so would constitute a material breach of the Licensing Agreement, requiring relinquishment and return of all Asahi intellectual property and licenses, and allowing Asahi to terminate the agreement. Any party was entitled to "seek injunctive relief with respect to any actual or threatened breach of this Agreement, which breach would cause irreparable harm to the Party seeking such relief, from a court of competent jurisdiction."[14]

### 2. *Application of* Texaco *to Premerger Activities*

■ Finding no directly applicable California authority to support its position, Asahi relies primarily on federal cases under the Sherman Act, asserting that "the Cartwright Act is construed in accord with the interpretation courts give to the Sherman Act." There is a similarity in language and purpose between the federal and state statutes. The Cartwright Act, like the Sherman Act, "was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade." (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680 [60 Cal.Rptr.2d 195], fn. omitted.) In *Texaco*, however, our Supreme Court recognized that the Sherman and Cartwright Acts differ in legislative intent and history, as well as in statutory construction and language, and explained that "judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent . . . ." (*Texaco, supra,* 46 Cal.3d at p. 1164.) "[F]ederal precedents must be used with caution because the acts, although similar, are not coextensive. [Citation.]" (*Freeman, supra,* 77 Cal.App.4th at p. 183, fn. 9.) "[T]he appropriate use of federal cases interpreting the Sherman Act is as an aid in interpreting our own Cartwright Act, not as controlling precedent . . . ." (*Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1240 [18 Cal.Rptr.2d 308]; see also *Knevelbaard Dairies v. Kraft Foods, Inc.* (9th Cir. 2000) 232 F.3d 979, 985 [role of federal antitrust precedents in a Cartwright Act analysis is "limited: they are 'often helpful' but not necessarily decisive"].)

Some federal circuits appear to have at least implicitly recognized a potential cause of action under section 1 of the Sherman Act for a premerger

---

[14] Section 13.10 of the Licensing Agreement otherwise provides for mandatory and binding commercial arbitration of contractual disputes between the parties. Some exhibits submitted in relation to the motion for summary adjudication appear to be excerpts from testimony submitted in International Chamber of Commerce arbitration proceedings arising from this dispute. The outcome of that proceeding is not directly relevant to the issues before us.

combination or conspiracy—at least with respect to per se antitrust violations such as price fixing.[15] (*Vollrath Co. v. Sammi Corp.* (9th Cir. 1993) 9 F.3d 1455 (*Vollrath*); *Lantec, Inc. v. Novell, Inc.* (10th Cir. 2002) 306 F.3d 1003 (*Lantec*).)

In *Vollrath*, the plaintiff alleged that the defendant, a subsidiary, and another later-acquired subsidiary violated the Sherman Act through a predatory pricing scheme for imported stainless steel mixing bowls. (*Vollrath, supra*, 9 F.3d at p. 1457.) The matter was submitted to a jury on theories including both an attempt and conspiracy to monopolize in violation of section 2 of the Sherman Act, as well as conspiracy to restrain trade in violation of section 1 of the Sherman Act. The jury returned a verdict for the plaintiff, but the trial court granted a motion for judgment notwithstanding the verdict. (*Vollrath*, at pp. 1457–1459.) The Ninth Circuit affirmed, and found, among other things, that the district court properly held that under *Copperweld* there could be no conspiracy following an acquisition of one of the defendants by another. (*Id.* at p. 1463.) Asahi asserts that *Vollrath* nevertheless recognized that the existence of a premerger conspiracy was an issue properly considered by a trier of fact. The conspiracy factually alleged in *Vollrath*, however, was an agreement to engage in below-cost pricing so as to monopolize the stainless steel mixing bowl market, a violation of section 2 of the Sherman Act (*Vollrath*, at p. 1463), for which there is no analog in the Cartwright Act. Further, under federal law, anticompetitive mergers are subject to scrutiny under both sections of the Sherman Act, as well as under the Clayton Act (15 U.S.C. § 18 [expressly prohibiting an acquisition or merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition . . . may be substantially to lessen competition, or to tend to create a monopoly"]). (*United States v. First Nat. Bank* (1964) 376 U.S. 665, 669–673 [12 L.Ed.2d 1, 84 S.Ct. 1033].)

In *Lantec*, the plaintiff alleged that a merger between Novell and WordPerfect was unlawful as a vertical combination and conspiracy in restraint of trade under section 1 of the Sherman Act, and that Novell conspired with WordPerfect to monopolize the relevant software market in violation of section 2 of the Sherman Act. (*Lantec, supra*, 306 F.3d at pp. 1022–1023.) Following presentation of the claims to a jury, the trial court granted judgment for the

---

[15] "Under both California and federal law, agreements fixing or tampering with prices are illegal per se." (*Oakland-Alameda County Builders' Exchange v. F. P. Lathrop Constr. Co.* (1971) 4 Cal.3d 354, 363 [93 Cal.Rptr. 602, 482 P.2d 226]; see *Knevelbaard Dairies v. Kraft Foods, Inc., supra*, 232 F.3d at p. 986.) " 'California and federal antitrust law under the two acts generally distinguish between conduct that is per se unlawful and conduct that is evaluated under the rule of reason. The law conclusively presumes manifestly anticompetitive restraints of trade to be unreasonable and unlawful, and evaluates other restraints under the rule of reason. [Citations.]' [Citation.]" (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra*, 114 Cal.App.4th at pp. 334–335.)

defendants as a matter of law. (*Id.* at p. 1011.) The Tenth Circuit affirmed. Here again, a conspiracy to monopolize was alleged under section 2 of the Sherman Act, and the reviewing court only implicitly accepted the viability of a premerger conspiracy claim under section 1 of the Sherman Act in finding that Lantec had in any event failed to define a relevant market as a predicate to pursuing such claims. (306 F.3d at pp. 1024–1028.) *Lantec*'s discussion of premerger conduct of the defendants was limited entirely to the plaintiff's section 2 Sherman Act claims.

Asahi also directs our attention to *Omnicare, Inc. v. UnitedHealth Group, Inc.* (N.D.Ill. 2007) 524 F.Supp.2d 1031 (*Omnicare*), a federal trial court decision in the Seventh Circuit denying a motion to dismiss a section 1 Sherman Act claim based on alleged premerger price fixing by two prescription drug providers. This is the only case cited by Asahi that expressly discusses antitrust liability for concerted action between merging companies. The court found that the claim could not be dismissed at the pleading stage because "[i]t is at least plausible that two competitor corporations that are going through a process of merger continue to retain separate economic interests." (*Omnicare*, at p. 1039.) However, the plaintiff had alleged "that the decision to enter into a merger agreement on certain [anticompetitive] terms was itself an unlawful agreement" (*id.* at pp. 1037–1038), and the trial judge relied not on any controlling case authority, but rather scholarly argument that combining firms should be continued to be treated as separate actors until a merger is fully consummated (*id.* at p. 1039, citing to an argument now found in 7 Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (3d ed. 2010) § 14E, ¶ 1464h, pp. 227–228 (hereafter, Areeda & Hovenkamp)).

Professors Areeda and Hovenkamp, in their multivolume treatise, address this specific point in a single sentence within a far more extensive analysis of "Intraenterprise Conspiracy" (Areeda & Hovenkamp, *supra*, § 14E, ¶¶ 1462–1478, pp. 199–377)—a doctrine that the U.S. Supreme Court has since characterized as "defunct." (*American Needle, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2210].) Their analysis and comment is, of course, also focused entirely on application of federal law, including sections 1 and 2 of the Sherman Act, and does not purport to address the scope of our Cartwright Act. The argument relied upon by the federal trial court in *Omnicare* and by Asahi here, begins with an observation that, "Acquisitions are tested under the antitrust laws under a prophylactic standard that reaches most mergers that have any significant anticompetitive potential. Once we presume that a merger is lawful, the additional deterrence afforded by a continuing intraenterprise conspiracy doctrine is unnecessary and unwise. . . . Any increment in anticompetitive potential that resulted from the merger should be challenged in a lawsuit challenging the merger itself. Assuming its legality, the post-merger firm must thereafter be regarded as a single entity. [¶] *The flip side of*

*the coin is that as a general rule firms contemplating mergers remain separate actors until their transaction is consummated.*" (Areeda & Hovenkamp, *supra*, § 14E, ¶ 1464h, pp. 227–228, italics added & fns. omitted.) With regard to the italicized comment, the authors expressly noted their disagreement with a contrary holding in *International Travel Arrangers v. NWA, Inc.* (8th Cir. 1993) 991 F.2d 1389 (*NWA*). (Areeda & Hovenkamp, *supra*, § 14E, ¶ 1464h, p. 228, fn. 41.)

In *NWA*, a tour operator sued Northwest Airlines, Inc., and affiliated companies, claiming violations of sections 1 and 2 of the Sherman Act, and the Clayton Act, together with state law breach of contract and fraud claims. The jury found that Northwest Airlines did not conspire with a subsidiary prior to a merger, but found for the plaintiff on its claims that the defendants had monopolized and attempted to monopolize through predatory pricing. (*NWA, supra*, 991 F.2d at p. 1392.) On a cross-appeal, the plaintiff contended that the trial court had improperly instructed the jury, arguing that the rule announced by the Supreme Court in *Copperweld*—"that a parent and its wholly owned subsidiary 'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act,'—[could not] properly be applied to insulate from Sherman Act liability joint actions by two previously independent competitors taken after they had agreed to merge but before the merger had been consummated."[16] (*NWA*, at p. 1397.) The Eighth Circuit disagreed, approving the jury instruction (thus allowing the jury to determine the economic substance of the relationship between the two entities) and stating "[w]e do not conclude, as [plaintiff] would have us do, that only the formal consummation of a merger precludes the application of section 1 of the Sherman Act to an alleged conspiracy between the merging companies." (*Id.* at p. 1398.)

What the cited federal authorities suggest is that section 1 of the Sherman Act may, at least under some circumstances, reach premerger anticompetitive conduct, dependent upon the economic reality of the acquired and acquiring entities as independent actors. This approach appears to be generally consistent with the requirement of our own cases that an antitrust plaintiff must plead and prove that separate entities maintaining separate and independent interests, combined for the purpose of restraining trade. (See *Freeman, supra*,

---

[16] One of the contested instructions advised the jury "Section 1 of the Sherman Act prohibits only those unreasonable restraints of trade which are affected by a contract, combination or conspiracy between separate entities. The economic substance of the relationship between two entities determines whether they are 'separate' for purposes of a section 1 conspiracy. Where the entities possess an inherent unity of economic interest and purpose, they are not separate entities capable of conspiring. Thus, if you find that NWA, Inc., Northwest, and [Mainline] lacked independent economic consciousness after they had decided to merge and before the merger was completed, they were not capable of conspiring together at that time." (*NWA, supra*, 991 F.2d at p. 1397.)

77 Cal.App.4th at p. 189; *G.H.I.I. v. MTS, Inc., supra,* 147 Cal.App.3d at p. 266 ["it is well settled that a complaint for antitrust violations which fails to allege such concerted action by separate entities maintaining separate and independent interests is subject to demurrer"].)[17]

Asahi directs our attention to no California case, however, and we have found none, applying the Cartwright Act to penalize conduct during the merger process that would unquestionably be exempt from antitrust scrutiny upon consummation of the merger. *Copperweld* teaches that where the entities possess an inherent unity of economic interest and purpose, they are not separate entities capable of conspiring. Even legally distinct entities do not conspire if they "pursue[] the common interests of the whole rather than interests separate from those of the [group] itself . . . . Because [such] coordination . . . does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not activity that warrants [Sherman Act section 1] scrutiny." (*Copperweld, supra,* 467 U.S. at pp. 770–771.)

"[S]ubstance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1." (*Copperweld, supra,* 467 U.S. at p. 773, fn. 21.) "[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination . . . , or conspiracy' is concerted action—that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a 'contract, combination . . . or conspiracy' amongst 'separate economic actors pursuing separate economic interests,' . . . such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' . . . and therefore of 'diversity of entrepreneurial inter-ests,' . . . and thus of actual or potential competition . . . . [¶] . . . [¶] . . . [T]he inquiry is one of competitive reality . . . ." (*American Needle, supra,* 560 U.S. at pp. ___–___ [130 S.Ct. at pp. 2211–2212], citations omitted.)

We have difficulty seeing how application of the Cartwright Act in the con-text presented here would further the policy of " 'unrestrained interaction of competitive forces' " that the antitrust laws seek to advance. (*Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 935 [130 Cal.Rptr. 1, 549 P.2d 833].) The " 'central evil' addressed by Sherman Act § 1" is "the cartel eliminating competition that would otherwise exist." (Areeda & Hovenkamp,

---

[17] Professor Areeda suggests that the question of economic integration should not be left to "a vaguely instructed jury" and "[j]udges, not juries, should define the purposes of the antitrust statutes and choose the conception that properly implements those purposes." (Areeda, Comment, *Intraenterprise Conspiracy in Decline* (1983) 97 Harv. L.Rev. 451, 469–470, fns. omitted.)

*supra*, § 14E, ¶ 1462b, p. 203.) The antitrust laws "supervise[] conspiracies because they increase market power *or make possible a restraint that could not otherwise be achieved.*" (*Ibid.*, italics added & fn. omitted.) Assuming a merger that is otherwise lawful,[18] the combination inherent in the merger is what eliminates competition that would otherwise exist, and which makes possible restraints that could not otherwise be achieved. It is the merger itself that "deprives the marketplace of the independent centers of decisionmaking" and results in a single aggregation of economic power. (*Copperweld, supra*, 467 U.S. at p. 769; see *American Needle, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2212].)

And the combination resulting from a merger may well have anticompetitive effects, whether intended or incidental. As the Supreme Court observed in *Copperweld*, "[a]n unreasonable restraint of trade may be effected not only by two independent firms acting in concert; a single firm may restrain trade to precisely the same extent if it alone possesses the combined market power of those same two firms." (*Copperweld, supra*, 467 U.S. at p. 775.) But in *Texaco*, our high court expressly concluded that the Legislature "did not intend the Cartwright Act to regulate the bona fide purchase and sale of one firm by another," and that it applied only to those who "continue as separate, independent, competing entities during *and after* their collusive action." (*Texaco, supra*, 46 Cal.3d at p. 1163, italics added.)

A merger is definitionally a combination of formerly separate interests. It is necessarily effectuated by "collusion" of the parties. The separate entities "possess an inherent unity of economic interest and purpose" in consummation of the merger, and the ultimate interests of the subsidiary and the parent are identical thereafter. (*NWA, supra*, 991 F.2d at p. 1397; see *Copperweld, supra*, 467 U.S. at pp. 771–773 & fn. 18; *Texaco, supra*, 46 Cal.3d at pp. 1152–1153 [in a bona fide merger "the entities lose forever their separate identities, and become a new, independent entity"].) Alignment of the business objectives of the acquired company with the new parent is the inevitable result. The "competitive reality" is that independent economic decisionmaking is compromised, even if not eliminated, once companies have formally agreed to merge. That compromise is exemplified by the Acquisition Agreement executed here by Actelion and CoTherix. CoTherix, for example, on signing the Acquisition Agreement, surrendered its freedom of action in the conduct of its business affairs as an independent entity by obligating itself to numerous contractual covenants and conditions, including limitations on its

---

[18] CoTherix notes that both Actelion U.S. Holding Company and CoTherix filed preacquisition notifications of the proposed merger with the U.S. Department of Justice and the Federal Trade Commission as required by the federal Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Pub.L. No. 94-435 (Sept. 30, 1976) 90 Stat. 1383), and that neither agency challenged the acquisition as anticompetitive. Since Asahi specifically disclaims any challenge to the validity of the merger, the effect of such a filing is not directly relevant to the issue before us.

preclosing ability to incur indebtedness, make certain capital expenditures, and engage in certain dealings with its employees (Acquisition Agreement, art. VIII, § 8.1).

The coordinated or concerted action between Actelion and CoTherix alleged by Asahi, and the focus of its evidentiary showing, was that the principals of the two entities, in preparation for the proposed acquisition, agreed to give false assurances to Asahi that development of Fasudil would continue, while planning to do otherwise once Actelion controlled CoTherix. But the resulting loss of independent decisionmaking by CoTherix on the development of Fasudil, and the ultimate implementation of business objectives defined entirely by Actelion as the parent, were inherent in the combination between the two companies. It is difficult to see how our antitrust policies are furthered by´ saying that parties may not, in the process of merging, reach agreement to do that which the combined entity may freely do. The rationale of *Texaco*—that the Cartwright Act was intended to apply "only to situations in which the parties improperly collude *and continue as* separate, independent entities, and not to situations in which, by virtue of purchase and sale, or merger, one or more of the entities ceases to exist" (*Texaco, supra,* 46 Cal.3d at p. 1167, some italics added)—would seem equally applicable in these circumstances.

■ But even if we were to conclude (or find a triable factual issue) that Actelion and CoTherix remained capable of conspiring in the period between execution of the Acquisition Agreement and the consummation of the merger, we find that Asahi fails to present a viable claim here.

## F. *Asahi Fails to Establish a Viable Cartwright Act Claim*

Asahi's theory of the case can best be summarized as follows: at least one of Actelion's purposes in acquisition of CoTherix was to eliminate Fasudil as a competitive threat to Tracleer; CoTherix was aware of Actelion's purpose; as part of an agreed "strategy" Actelion directed CoTherix and its principals to give false assurances to Asahi that development of Fasudil would continue under the Licensing Agreement; in reliance on those assurances, Asahi did not pursue available remedies which would have allowed it to impede or halt the Actelion/CoTherix merger.[19] Thus, Asahi concludes, CoTherix and Actelion "overcame a necessary hurdle" by dissuading Asahi from exercising its pre-acquisition rights and, by "[t]hwarting Asahi's exercise of its [Licensing]

---

[19] At oral argument, Asahi's counsel contended that there was a conspiracy, during the period between the Acquisition Agreement and closing of the merger, to *delay* the approval process for Fasudil, and that Asahi suffered consequential damages during that period. Asahi neither pled nor argued such a claim in the trial court and presented no such argument in its briefing here.

Agreement rights[,] thwarted Fasudil's development as a competitive product." In other words, the conduct of the parties in the course of effectuating their merger ultimately achieved Actelion's intended anticompetitive result. Asahi fails to demonstrate, however, how Cartwright Act penalties would properly apply in such circumstances.

Asahi failed to produce evidence of any premerger meeting of the minds specifically to restrain the trade of Fasudil. As the trial court observed in its order, Asahi's complaint alleges that "Actelion, unilaterally, decided to acquire CoTherix in order to further its own goal to dominate the market." Because this alleged anticompetitive purpose was "attributed only to Actelion and the Individual Defendants and *not to CoTherix*, . . . there [was] no combination of capital, skill or acts 'by two or more persons' for the purpose of preventing competition." The agreement or collusive "strategy" on which Asahi bases its Cartwright Act claim was to " 'prevent Asahi from exercising its rights under the Fasudil Agreement in a way that could potentially disrupt Actelion's acquisition of CoTherix.' " In later granting summary adjudication in favor of Actelion, another trial judge separately found, "the only premerger agreement alleged . . . between Actelion and CoTherix is an agreement not to comply with the change of control provision of the [L]icense [A]greement . . . [, but this] . . . agreement is not a violation of the Cartwright Act because it is not an agreement to restrain competition, i.e., not an agreement to end the sale of Fasudil." Rather, "[t]he goal and purpose of the alleged 'conspiracy' [between CoTherix and Actelion] was to achieve a merger." In both instances the court found that the conduct alleged did not, as a matter of law, establish a violation of the Cartwright Act. We agree.

Asahi protests that it was not required to produce evidence of a shared common purpose or motive, but only the existence of a combination resulting in an anticompetitive effect. The anticompetitive *effect* that Asahi complains of, however, results not from any premerger agreement between the parties, but from ultimate consummation of the merger. Asahi's theory hinges on what it posits as its ability to impede or prevent the merger. Nothing in the Licensing Agreement provides for such a remedy. Citing section 13.10(b) of the Licensing Agreement, Asahi contends that, had it known the true facts, it "would have investigated all legal means to require the continued development of Fasudil" and that it "could have sued for injunctive relief, and thereby delayed or even caused a breakdown of Actelion's planned acquisition." While Asahi had the right to declare a material breach of the Licensing Agreement, and to terminate it, if it failed to receive reasonable assurances of continued development of Fasudil, nothing in the Licensing Agreement purports to give Asahi the right to prevent a "Change of Control," and Asahi fails to suggest how it could have successfully enjoined the *merger*. Certainly, as *Texaco* makes clear, it could not have done so under the Cartwright Act.

█ The essence of Asahi's claim is that CoTherix breached the terms of the Licensing Agreement, that Actelion induced it to do so, and that development of Fasudil as a competitive product was "thwarted" as a result. What the undisputed evidence shows, however, is that development of Fasudil, at least by CoTherix, was thwarted by Actelion's acquisition of CoTherix. While Asahi presented voluminous evidence relating to the harm which it claims to have suffered as a result, the Cartwright Act, like all antitrust laws, is about " ' " 'the protection of *competition*, not *competitors*.' " ' [Citation.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 186 [83 Cal.Rptr.2d 548, 973 P.2d 527]; see also *Indiana Grocery, Inc. v. Super Valu Stores, Inc.* (7th Cir. 1989) 864 F.2d 1409, 1413 [Sherman Act "does not reach conduct that is only unfair, impolite, or unethical"].) " 'Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws. [Citations.]' [Citation.]" (*People's Choice Wireless, Inc. v. Verizon Wireless* (2005) 131 Cal.App.4th 656, 662–663 [31 Cal.Rptr.3d 819].)

### III. DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied April 3, 2012, and appellant's petition for review by the Supreme Court was denied June 13, 2012, S201718.