Filed 11/20/13  P. v. Parker CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KATIE LYNN PARKER et al.,<br><br>Defendants and Appellants. | F062920<br><br>(Super. Ct. Nos. BF130803A, BF130803B, BF130803C)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Syda Kosofsky, under appointment by the Court of Appeal, for Defendant and Appellant Katie Lynn Parker.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Matthew Davis Bryant.

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant Stuart James Carroll.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In June of 2011, appellants Katie Lynn Parker, Matthew Davis Bryant and Stuart James Carroll were convicted after a joint jury trial of possessing marijuana for purpose of sale. (Health & Saf. Code, § 11359.)[1] Parker was also convicted of vehicle theft and driving a stolen vehicle. (Veh. Code, § 10851, subd. (a); Pen. Code, § 496d.) Bryant was also convicted of possessing a billy club. (Pen. Code, § 12020, subd. (a).)[2] Appellants were placed on three years' probation, including one year in county jail.

Appellants argue the trial court erroneously denied a suppression motion and further erred by admitting evidence pertaining to the marijuana quantity limits contained in Health and Safety Code section 11362.77. They also challenge the limiting instruction pertaining to this evidence. Parker separately argues that the trial court erred by refusing to instruct on claim of right as an affirmative defense to the theft charges. Bryant separately argues that former Penal Code section 12020 unconstitutionally restricts his right to bear arms in self-defense. Both Parker and Bryant challenge the denial of their

---

[1] The jury acquitted appellants of unlawfully cultivating marijuana and acquitted Carroll of unlawfully possessing nunchakus. (Health & Saf. Code, § 11358; Pen. Code, § 12020, subd. (a).)

[2] The Deadly Weapons Recodification Act of 2010 repealed and recodified former sections 12000 to 12809 without substantive change. (Pen. Code, §§ 16000, 16005; Cal. Law Revision Com. com., 51D pt. 2 West's Ann. Pen. Code (2012 ed.) foll. § 16000, p. 317.) Former section 12020 was recodified at Penal Code section 22210, operative January 1, 2012. (Stats. 2010, ch. 711 (S.B. 1080), § 6.)

motions to reduce their wobbler convictions to misdemeanors. None of these arguments is convincing. The judgments will be affirmed.

**FACTS**

### I.      Possession of Marijuana

#### A.      Prosecution evidence.

Parker and Bryant are married. On January 27, 2010, the residence they shared with Carroll was searched. Officers found a total of 137 marijuana plants growing inside it; 45 of the plants were mature, meaning they were ready for harvest, and 92 of the plants were immature. Officers also found a few ounces of processed marijuana, packing materials, a scale and a number of items associated with marijuana use: bongs, a pipe, rolling papers and lighters. A bundle of 40 to 50 marijuana stalks and several pots containing marijuana stubs were found in the backyard. A camera found in a bedroom contained photos depicting a marijuana garden that had a greater number of mature plants than officers found growing in the house.

Kern County Sheriff's Deputy Michael Booker testified as a marijuana expert.[3] He opined that the marijuana plants were being grown for the purpose of sale. In reaching this conclusion Booker considered the number of plants, their projected yield, and the presence of a scale and packaging materials in the house. Booker testified that an average marijuana plant can yield a pound of useable marijuana. The marijuana stalks found in the backyard would have produced 20 pounds of marijuana.

#### B.      Defense evidence.

Bryant and Parker testified that, together with Carroll, they cultivated marijuana solely for personal use to alleviate medical symptoms. Bryant testified that they began

---

[3]      Solely to enhance readability titles (e.g., deputy, doctor) will be omitted after the first reference. No disrespect is intended or implied by this informality.

3.

growing marijuana in 2009 using the two-stage sea of green method. The expected yield for all 45 mature plants was eight ounces of marijuana. Twelve plants were harvested in late November to early December of 2009 and Bryant photographed the crop to document its shortcomings.

Christopher Conrad testified for the defense as a marijuana expert. He opined that the expected total yield for the 45 mature marijuana plants was three-quarters of a pound of marijuana. He estimated that three users of medical marijuana could consume three-quarters of a pound of marijuana in one month. Conrad testified that many of the typical indicia of marijuana sales were not present at the house and the continuous harvest method of marijuana cultivation is commonly used when marijuana is grown for personal use.

Each appellant possessed a medical marijuana recommendation. Dr. Hany Assad wrote Bryant's medical marijuana recommendation. Dr. Daniel Cham wrote Carroll's medical marijuana recommendation. Neither Assad nor Cham recommended a specific amount of marijuana. Parker testified that she obtained a medical marijuana recommendation from Dr. Colton in February of 2009. Colton said she could use marijuana as "medically necessary," which she understood as meaning that she "was to use medical marijuana as needed."

## II. Vehicle Theft.

### A. Prosecution evidence.

In 2005, Parker's sister, Stacia Hall, received the Camry as a gift. It stopped running in 2009 so Hall obtained a certificate of non-operational status from the Department of Motor Vehicles (DMV). In October 2009, Hall parked the Camry at an abandoned house located in Taft that her grandmother owned.

Bryant attempted several times to acquire the Camry from Hall. He asked for the Camry as a gift, offered to trade for it and finally offered to purchase it. Each time Hall

refused, explaining to Bryant that she did not want to part with the Camry because she could not afford to purchase another car.

One day in December 2009, Hall brought a mechanic to examine the Camry and discovered that it was missing. Later that day, Hall was driving a different vehicle in Taft when she saw Parker driving the Camry. Hall honked her horn at Parker, who sped away. Hall immediately reported the Camry as stolen to the police.

On January 2, 2010, Hall received a package from Parker. It contained some lien documents pertaining to the Camry, a voter's registration card, a Spanish language driving manual and a driver training booklet.

On January 27, 2010, Booker conducted a traffic stop of the Camry, which was being driven by Parker. She did not have any proof of ownership or registration. She said that the car belonged to Bryant, who purchased it at a lien sale.

## B. Defense evidence.

Parker testified that Hall abandoned the Camry on their grandmother's property. Parker called Hall several times and sent her a letter asking Hall to remove the car. Parker purchased car parts costing $600 and Bryant repaired the Camry. After Hall saw Parker driving the Camry, Parker drove it to Bakersfield. Hall telephoned Parker and said that she wanted her car back. Instead of returning the Camry to Hall, Parker sold it to Bryant for $500 at a lien sale conducted at their residence; they were the only people present at the sale.

Bryant testified that the DMV issued registration for the Camry in his name during 2010.

## C. Possession of a billy club.

A billy club was found on the ground by the door of the bedroom where the marijuana plants were growing. A set of nunchakus was found in this bedroom. Bryant testified that the billy club belonged to him. He inherited it from his deceased

5.

grandfather who had been a police officer. Bryant said he used the billy club once or twice as an extension rod for a paint roller. Bryant did not keep it as a weapon.

## DISCUSSION

### I. The Suppression Motion Was Properly Denied.

#### A. Facts.

Parker filed a written motion to suppress evidence seized from the house; codefendants joined in the motion. The People filed written opposition. An evidentiary hearing was conducted.

Booker testified at the hearing that during January 2010 the Kern County Sheriff's Department received an anonymous citizen tip that "Matthew and Katie" were growing and selling marijuana at a specific house located in Bakersfield (hereafter the house).[4] Booker, who worked in the narcotics unit, was assigned to investigate.

On January 27, 2010, he drove by the house to ascertain who lived there. He saw the Camry parked in the driveway. He ran the Camry's license plate through dispatch and learned that it had been reported stolen. A short time later Parker exited the house and started driving the car. Booker followed her and performed a traffic stop. Parker said that the Camry belonged to Bryant, who had purchased it at a lien sale. Parker did not have any proof of ownership or registration. She said there was another set of car keys inside the house. Booker arrested Parker for car theft. Officers found a film canister containing a small amount of marijuana inside the Camry. Parker said that the marijuana belonged to her and she had a medical marijuana recommendation. Parker also said that there were some marijuana plants at the house.

Booker testified that he decided to search the house when Parker told him there was another set of car keys inside it. Booker and several officers went to the house to

---

[4]     The anonymous tipster referenced the house's address.

6.

"freeze [it] in expectation of getting a search warrant." Booker testified that freezing the house meant entering and taking control of it. Booker decided to freeze the house because he did not know how long Parker "was going to be gone, and we didn't know if the keys or the other evidence in the house would disappear."

Bryant answered the front door of the house in response to Booker's knock. Booker said that Parker had been arrested for possession of a stolen vehicle. He asked Bryant to step out of the house. In response, Bryant asked Booker if he had a search warrant. Booker said that he did not have a search warrant but he "had reason to believe that there was evidence tied into the stolen vehicle that was in the house, and then I asked him a second time to step out." Instead, Bryant tried to step back in the house and close the door. Booker grabbed Bryant by the arm and pulled him out of the house. Bryant closed the door as Booker removed him from the house. Booker "shouldered [his] way through the door to contact the other person inside." Several police officers followed Booker into the house. Carroll, who was laying on a couch in the living room, was removed from the house. The officers checked each room of the house. They saw approximately 80 to 100 immature marijuana plants growing in a bedroom and a closet. They also saw a glass jar containing processed marijuana resting on top of a coffee table in the living room.

Booker testified that he considered Bryant's actions of closing the door and refusing to permit him access to the house to be aggressive. These actions caused him to become concerned for officer safety.

After freezing the house, Booker applied for a search warrant. Booker's probable cause affidavit set forth all of the circumstances concerning the anonymous tip, Parker's arrest for vehicle theft, statements Parker made to Booker and observations he made during the protective sweep.

7.

The search warrant was issued later that day to search for "[d]uplicate keys and or documents" related to the Camry as well as for items related to marijuana cultivation, possession and sale. The warrant was executed that same day. The return to the search warrant listed DMV documents addressed to Bryant, a vehicle bill of sale and mail addressed to Parker among the items that were seized from the house. It also listed the marijuana plants and marijuana related items previously set forth. A second set of car keys was not found in the house.

Parker testified at the suppression hearing that in response to Booker's question whether there was a second set of car keys she "told him that I wasn't aware of any other keys."

The suppression motion was summarily denied.

**B.    Denial of the suppression motion was not erroneous.**

Appellants argue the trial court erred by denying the suppression motion because the protective sweep was unreasonable and, absent information gathered during the protective sweep, the remaining information was insufficient to establish probable cause to search the house. Respondent argues that the protective sweep was legal.

We have determined that it is not necessary to decide questions surrounding the legality of the protective sweep. Assuming, for purposes of this discussion only, that the sweep was not constitutional, the suppression motion was properly denied because the independent source and inevitable discovery doctrines apply to this case. Booker decided to seek a search warrant before the protective sweep was conducted. When observations made during the protective sweep are excised from the search warrant application, the remaining information is sufficient to establish probable cause to search the house. Consequently, the search warrant is lawful under the independent source doctrine. Since

evidence observed during the protective sweep inevitably would have been discovered when the warrant was served, it is admissible under the inevitable discovery rule.[5]

### 1. The search warrant is lawful under the independent source doctrine.

"The independent source doctrine applies in California." (*People v. Weiss* (1999) 20 Cal.4th 1073, 1078.) This doctrine permits "'admission of evidence that has been discovered by means wholly independent of any constitutional violation.... [It] teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. [Citations.] When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' [Citation.]" (*Id.* at pp. 1077-1078.) "Where the affidavit supporting a search warrant contains both information obtained by unlawful conduct as well as untainted information, a two-prong test applies to justify application of the independent source doctrine. [Citation.] First, the affidavit, *excised of any illegally obtained information*, must be sufficient to establish probable

---

**5** This issue is not being decided on the basis of new theories that were not raised in the trial court. The prosecutor argued in his opposition papers and during the suppression hearing that the independent source and inevitable discovery doctrines applied. Consequently, the defense had notice of these theories and an opportunity to present evidence in opposition. Also, the record fully sets forth all of the factual bases necessary for application of these theories. Even if the prosecutor had not expressly raised these doctrines, it is not improper for a reviewing court to decide the merits of a Fourth Amendment theory for the first time on appeal when the factual basis for the theory is fully set forth in the record and the defendant had notice and an opportunity to present evidence in opposition. (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1242; *People v. Robles* (2000) 23 Cal.4th 789, 801, fn. 7; *Green v. Superior Court* (1985) 40 Cal.3d 126, 137-138.)

cause. [Citation.] Second, the evidence must support a finding that 'the police subjectively would have sought the warrant even without the illegal conduct.' [Citations.]" (*People v. Robinson* (2012) 208 Cal.App.4th 232, 241.)

Both prongs of this two-part test were satisfied. First, Booker's decision to apply for a warrant to search the house was not based on observations made during the protective sweep. Booker decided to apply for a warrant to search the house after he arrested Parker. Booker averred in his search warrant application that Parker told him there was a second set of car keys in the house. Booker also averred that he told Parker that he was going to the house "to retrieve the key to the stolen vehicle." During the evidentiary hearing Booker testified that he went to the house to "freeze" it in expectation of obtaining a search warrant. He was concerned that other people at the house "might get rid of whatever evidence would be in the house as far as what's tied into the vehicle as far as, i.e., the keys."

Second, there was probable cause to search the house independent of observations made during the protective sweep. "To determine the existence of probable cause, we consider whether under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' [Citation.] Put another way, 'probable cause to search [exists] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found [citations].' [Citation.]" (*People v. Little* (2012) 206 Cal.App.4th 1364, 1371-1372.) Established principles governing the standard of review apply to this probable cause determination. We defer to the trial court's factual findings if they are supported by substantial evidence. Then we independently decide whether, under the facts as found by the trial court, the challenged police action was lawful. Deference is normally accorded to a magistrate's determination of probable cause to issue a warrant. However, no such deference is accorded "when police officers include tainted

10.

information in a warrant application.  [Citation].  Accordingly, we determine de novo whether the search warrant affidavit is sufficient to establish probable cause to search [the house] absent the information obtained by the illegal entry into that residence." (*People v. Robinson, supra*, 208 Cal.App.4th at p. 241.)

Having applied this standard, we conclude that probable cause existed to search the house for the second set of car keys and documents related to ownership of the Camry.  Parker told Booker that there was a set of car keys inside the house.[6]  She also said that the Camry belonged to Bryant and that he purchased it at a lien sale.  Parker did not have any proof of ownership or registration for the Camry with her and none was found during a search of the vehicle.  Parker told Booker that she lived in the house with Bryant and Carroll.  Booker observed the Camry parked in the driveway of the house. Considered in their entirety, these facts are sufficient to lead a person of reasonable prudence to believe that evidence pertaining to theft of the Camry would be found inside the house.

We are not persuaded by the arguments advanced by Parker and Bryant that the second set of keys was not relevant evidence.  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  Items such as additional car keys, documents relating to the lien sale and DMV records are all relevant to issues

---

**6** Parker's testimony at the suppression hearing that she told Booker she was not aware of any other keys to the Camry raised a factual dispute on this point.  The trial court's denial of the suppression hearing operates as an implied finding in favor of Booker's credibility on this disputed issue.  Credibility determinations are the exclusive province of the trial court and its findings, express or implied, will be accepted on appeal if supported by substantial evidence.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 128.) Since Booker's testimony that Parker told him there was a set of car keys in the house was neither impossible nor inherently improbable, we uphold the trial court's credibility determination.

surrounding the identity of the car thief, how the theft was accomplished and when it occurred.

Since both prongs of the independent source doctrine are satisfied, we uphold the legality of the search warrant on this basis.

2. **All of the seized items inevitably would have been discovered during execution of the search warrant.**

We turn to application of the inevitable discovery doctrine. Under this doctrine, "illegally seized evidence may be used where it would have been discovered by the police through lawful means." (*People v. Robles, supra,* 23 Cal.4th at p. 800.) "It is the prosecution's burden to 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.' [Citations.] In that event, the deterrence rationale underlying the exclusionary rule would have 'so little basis that the evidence should be received.' [Citation.]" (*People v. Hughston* (2008) 168 Cal.App.4th 1062, 1071-1072, fns. omitted.)

The house and backyard were searched pursuant to a search warrant that we have upheld as constitutional. The marijuana plants and related evidence were discovered during execution of this warrant. The officers' actions did not exceed the scope of the warrant. "Searching officers may seize items specifically named in a valid warrant, as well as other items in plain view, provided the officers are lawfully located in the place from which they view the items and the incriminating character of the items as contraband or evidence of a crime is immediately apparent. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1041.) Under the circumstances presented here, all of the items seized from the house and backyard inevitably would have seen discovered during execution of the lawful search warrant. (*People v. Low* (2010) 49 Cal.4th 372, 393, fn. 10 [methamphetamine discovered during search of jailed defendant's clothes inevitably would have been found]; *People v. Superior Court* (*Chapman*) (2012) 204 Cal.App.4th

12.

1004, 1023 [inevitable discovery doctrine applied where dead body was found in a residence where a criminalist lived]; see also *U.S. v. Barker* (N.D. W.Va. 2013) 2013 WL 3246085 [marijuana hidden in ceiling inevitably would have been discovered during warranted search].)

Since the independent source and inevitable discovery doctrines apply, we uphold the ruling denying the suppression motion.

**II.    Appellants Were Not Prejudiced By Admission Of Evidence Pertaining To The Quantity Limitations Contained In Health And Safety Code Section 11362.77 Or By Jury Instructions Pertaining To This Evidence.**

**A.      Facts.**

Each appellant possessed a medical marijuana recommendation.  Parker's and Carroll's medical marijuana recommendations referenced Health and Safety Code section 11362.77 and Senate Bill 420.[7]

Parker filed a motion in limine "to exclude the [p]rosecution from cross-examining the defendant's medical doctors as to justifying the amount of marijuana they authorized the defendants to use under the Compassionate Use Act" (hereafter the CUA). Citing Evidence Code sections 210 and 352, Parker argued that such questions would elicit improper testimony about appellants' medications conditions, would violate their

---

[7]      Health and Safety Code section 11362.77, subdivision (a) provides:  "A qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient.  In addition, a qualified patient or primary caretaker may also maintain no more than six mature or 12 immature marijuana plants per qualified patient."

In *People v. Kelly* (2010) 47 Cal.4th 1008, which was decided after Parker's and Carroll's marijuana recommendations were written but prior to trial, our Supreme Court held that "[t]o the extent [Health and Safety Code] section 11362.77 (together with its quantitative limitations) impermissibly amends the [Compassionate Use Act] by burdening a defense that would be available pursuant to that initiative statute, section 11362.77 is invalid under California Constitution, article II, section 10, subdivision (c). Nevertheless, it would be inappropriate to sever section 11362.77 from the MMP and hence void that provision in its entirety."  (*Id*. at p. 1049.)

13.

right to privacy and would be excessively prejudicial and time consuming.  Carroll and Bryant joined in this motion.

The court excluded evidence pertaining to appellants' medical conditions.  It ruled that appellant's doctors could be asked "whether they were placing a quantitative limit on what can be possessed or whether they were ... simply stating the law ... which gives those person authority to possess that [cannabis]."

Booker testified he discussed with Parker the quantity limits set forth in Health and Safety Code section 11362.77 (hereafter quantity limits) and told her "that it appeared she had more plants than that." Parker said that "she thought she was only limited by the number of square feet."  Parker did not provide a "specific amount of square feet that she thought she was okay to grow."  Objection to this testimony on the grounds of relevance and improper legal conclusion were overruled.

Conrad, the defense's marijuana expert, was called out of order.  During a break in his testimony, defense attorneys argued that the prosecutor should be prohibited from questioning Conrad about the quantity limits.  Parker objected on the basis of lack of foundation, irrelevancy and potential confusion of the jury.  Carroll added objections on the basis of lack of personal knowledge and improper legal conclusion. The court overruled all of the objections and decided that Conrad could be examined about the quantity limitation to lay a foundation for later questions "regarding the defendants' state of mind, not for whether they possessed more than the law allows."  The court stated that it intended to give a limiting instruction.

Conrad testified that the number of marijuana plants found in the house exceeded the quantity limits.  Conrad testified that the quantity limits permitted two patients to

possess 12 mature plants or 24 immature plants.**8**  Conrad read into the record the language of Health and Safety Code section 11362.77 and then the court gave the following limiting instruction, without objection:

> "The quantities stated in Health & Safety Code Section 11362.77 is not the current state of the law.  This information is not being presented, nor can it be accepted by you during deliberations to mean that just because a defendant or the defendants possessed more than the quantity limitations in Health & Safety Code Section 11362.77 that a defendant or the defendants are automatically guilty of the allegations in this case.
>
> "Any evidence relating to this code section can only be considered as to a defendant or the defendant's state of mind at the time he[,] she or they possessed the marijuana.  This evidence is only be[ing] considered for that purpose and for no other."

As part of the jury charge, the court instructed on the CUA:

> "Possession or cultivation of marijuana is lawful if authorized by the [CUA].  The [CUA] allows a person to possess or cultivate marijuana for personal medical purposes when a physician has recommended such use.  The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs. [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes.  If the People have not met this burden, you must find the defendant not guilty of this crime."

Without objection, the court instructed on the quantity limits:

> "The quantity stated in Health & Safety Code Section 11362.77 are [*sic*] no longer ... the state of the law.   This information was not presented nor may be accepted by you to mean that just because a defendant possessed more than the quantity ... limitations in Health & Safety Code Section 11362.77 that a defendant is automatically guilty of the allegations in this case.  [¶]  The quantity stated in Health & Safety Code Section 11362.77 cannot be considered in any way as to Defendant Matthew

---

**8**     Bryant unsuccessfully motioned to strike Conrad's testimony about the quantity limits.

Bryant. Any evidence relating to this code section can be considered only as to whether Defendant Katie Parker or Stewart Carroll possessed marijuana in an amount that exceeded the amounts recommended by their physicians or in excess of their medical needs."

During the prosecutor's closing arguments, he asserted that Parker and Carroll possessed more marijuana than was permitted by the quantity limits and "exceeded what the [CUA] allowed."

One of the questions the jury asked during its deliberations concerned the quantity limitations. The foreperson asked: "We require the written language which states 6 mature 'or' 12 immature plants. We are attempting to apply this language to one of the charges. (It may apply to more.)"

**B.      Appellants were not prejudiced by admission of evidence pertaining to the quantity limitations**.

Appellants argue that evidence pertaining to the quantity limits was irrelevant and excessively prejudicial. This evidence was admitted for the limited purpose of proving Parker's and Carroll's state of mind at the time they possessed the marijuana. As will be explained, the prosecutor failed to prove a preliminary fact necessary to establish the relevance of the quantity limits evidence for this limited purpose. Yet, it is not reasonably likely that the jury would have returned a more favorable verdict if this evidence had been excluded. Therefore, the evidentiary error is harmless.

### 1. A preliminary fact was not proved.

Only relevant evidence is admissible. (Evid. Code, § 350.) Although "'there is no universal test of relevancy, the general rule in criminal cases [is] whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution[.]'" (*People v. Freeman* (1994) 8 Cal.4th 450, 491; Evid. Code, § 210.) When the relevancy of evidence depends on the existence of a preliminary fact, the party proffering the evidence bears the burden of producing adequate proof of the preliminary fact. (*People v. Rundle* (2008) 43 Cal.4th 76, 129 (*Rundle*), overruled on

16.

another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; Evid. Code, § 403, subd. (a)(1).) The proffered evidence is inadmissible unless the trial court finds that there exists sufficient evidence to sustain a finding of the existence of the preliminary fact by a preponderance of the evidence. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1120, overruled on another ground in *Rundle, supra,* 43 Cal.4th at p. 151.) "A trial court's decision as to whether the foundational evidence is sufficient is reviewed for abuse of discretion." (*Guerra, supra,* at p. 1120)

*Rundle, supra*, 43 Cal.4th 76 and *People v. Babbitt* (1988) 45 Cal.3d 660 are illustrative of this principle. In *Rundle*, our Supreme Court upheld exclusion of a list of names because the defendant failed to establish as a preliminary fact that the list was what he claimed it to be. The defendant's belief that the list chronicled a named person's list of sexual partners was purely speculative. (*Rundle, supra*, 43 Cal.4th at pp. 129-130.) *Babbitt* upheld exclusion of a television program log listing movies that were shown on channel 40 on the night of the charged crime. The defense's offer of proof was not sufficient to attach any significance to the program content of channel 40 because there was no evidence that the defendant turned on the television during that period of time. (*People v. Babbitt, supra*, 45 Cal.3d at p. 682.) The program log "would at most have provided a link in an incomplete chain of speculative inferences." (*Id*. at p. 683.)

In this case, evidence of the quantity limits was admitted solely to establish Parker's and Carroll's state of mind at the time they possessed the marijuana. The preliminary fact necessary to establish relevance for this purpose was Parker's and Carroll's knowledge of the statutory quantity limitations. Bryant argues that "[i]t was speculation that [Parker and Carroll] had actually read the quantity limitations or that the language had influenced their conduct." We agree.

The language of Carroll's and Parker's medical marijuana recommendations did not alert them that, when the recommendations were written Health and Safety Code

17.

section 11362.77 limited the amount of processed marijuana and marijuana plants that could legally be possessed under the CUA.[9] The recommendations provide, in pertinent part: "Pursuant to California Health & Safety Code Section 11362.5, Compassionate Use Act of 1996, also known as Prop 215. With this recommendation my patient is permitted to possess medical [cannabis] in quantities pursuant to California Health & Safety Code Section 11362.77, SB 420, and all local, city, and county guidelines." Reasonably read by a layperson, this sentence does not alert the patient that Health and Safety Code section 11362.77 placed specific limitations on the amount of marijuana that could legally could be possessed.

In addition, there was no evidence that the doctors who wrote the medical marijuana recommendations informed Parker or Carroll that there were statutory limits on the amount of processed marijuana or marijuana plants that could legally be possessed. Assad testified that physicians cannot recommend patients use a specific amount of marijuana because that would make the recommendation a prescription in violation of federal law. Cham testified that he did not recommend to Carroll a specific amount of marijuana or to place a limit on the quantity of marijuana he could use. Cham said, "My job is to disapprove and approve that he can use Cannibis or not. … [F]or the most part it's up to the patient to determine how much they can use." Cham testified that the reference to Health and Safety Code section 11362.77 in the medical marijuana recommendation was standard protocol language used by most physicians. Parker testified that Colton did not explain the reference to Health and Safety Code section 11362.77 in her marijuana recommendation. Colton did not tell her that there were any limits to the amount of processed marijuana she could possess or number of plants she could grow. He told her that she could use marijuana as medically necessary. Booker

_____

[9]    See footnote 7, *ante*.

18.

testified that when he told Parker that it appeared she had more plants than the quantity limits allowed, she replied that "she thought she was only limited by the number of square feet."

We, therefore, conclude the inference that the prosecution wished to draw from the statutory references contained in Parker's and Carroll's medical marijuana recommendations is speculative. "'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' [Citation.]" (*People v. Babbitt, supra*, 45 Cal.3d at pp. 681-682.) Consequently, the trial court abused its discretion by admitting testimony about the quantity limits. (*People v. Benavides* (2005) 35 Cal.4th 69, 90 [trial court "lacks discretion to admit irrelevant evidence"].)

**2. Admission of this evidence was not prejudicial.**

"[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides, supra,* 35 Cal.4th at p. 91.) The applicable standard of prejudice is that for state law error as set forth in *People v. Watson* (1956) 46 Cal.2d 818. Under the *Watson* standard, the erroneous admission of evidence is prejudicial only if it is reasonably probable that absent its admission the defendant would have received a more favorable result in the absence of the error. (*Id*. at p. 836.)

After examining the entire record, we hold that admission of evidence pertaining to the quantity limits was not prejudicial. This evidence was admitted only to prove Carroll's and Parker's states of mind at the time they possessed the marijuana. The jurors were given two limiting instructions, which they are presumed to have followed. (*People v. Ervine* (2009) 47 Cal.4th 745, 776.) The quantity limits evidence was not inflammatory or likely to evoke a bias against appellants. There was strong evidence proving appellants possessed the marijuana with the intent to sell. A large quantity of

marijuana plants were found in the house along with a scale and packaging materials. A bundle of 40 to 50 marijuana stalks and pots with marijuana stubs were found in the back yard. Yet only a small amount of processed marijuana was found in the house. All of the appellants were unemployed at the time of their arrest. Booker gave expert testimony that the marijuana was possessed for the purpose of sale. Appellants were acquitted of unlawful marijuana cultivation. It is not reasonably probable that any of the appellants would have been found not guilty of possessing marijuana for the purpose of sale if evidence pertaining to the quantity limits had been excluded.[10]

Appellants argue that the evidentiary error amounted to a denial of due process, requiring analysis for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). We are not convinced.

An erroneous exercise of discretion in the application of ordinary rules of evidence generally does not implicate the federal Constitution. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1403.) "[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair," which is a very "narrow due process argument on appeal." (*People v. Partida* (2005) 37 Cal.4th 428, 436.) "'To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.' [Citation.] "'The dispositive issue is ... whether the trial court committed an error which rendered the trial 'so

---

**10** Although the prosecutor did not refer to Parker's and Carroll's state of mind when he referenced the quantity limits during his closing arguments, we do not believe that it affected the jury. The jury was instructed to follow the court's instructions and not the arguments of counsel. (CALCRIM No. 200.) In addition, since appellants did not object to the prosecutor's arguments on this topic and any possible harm could have been cured, appellants have forfeited any possible prosecutorial misconduct claim related to these remarks. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1072.)

"arbitrary and fundamentally unfair" that it violated federal due process.' [Citations.]" [Citation.]' [Citation.]" (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20.)

Appellants did not satisfy this high constitutional standard. As previously explained, the jury was instructed on the limited purpose for which the quantity limits evidence was admitted. The testimony on this topic was not extensive and was not likely to evoke a bias or antipathy against appellants. This evidentiary error was not so arbitrary and prejudicial that it rendered the trial fundamentally unfair. Consequently, the *Chapman* standard of review does not apply.

### 3. The limiting instructions were not prejudicial.

Appellants also challenge the correctness of the court's limiting instructions. No objection was interposed below to either of the court's instructions on the use of quantity limits evidence. As a general rule, failure to object to an instruction forfeits appellate review of it. (*People v. Rivera* (1984) 162 Cal.App.3d 141, 146.) An exception to the rule of waiver arises, however, if the instruction affected the defendant's substantial rights. A defendant's substantial rights are affected if the instruction results in a miscarriage of justice, making it reasonably probable that absent the erroneous instruction defendant would have obtained a more favorable result. (*Ibid*; Pen. Code, §§ 1259, 1469.) "The cases equate 'substantial rights' with reversible error, i.e., did the error result in a miscarriage of justice? [Citations.]" (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978.)

We have examined the record and conclude that the limiting instructions did not affect appellants' substantial rights. "[E]ven if the instructions were erroneous, we could not find a miscarriage of justice." (*People v. Rivera, supra*, 162 Cal.App.3d at p. 146.) The sentence contained in the limiting instruction that was given during the final jury charge stating that appellants were not "automatically guilty" just because they possessed more marijuana than was permitted by the statute is not reasonably read as lowering the

burden of proof.[11]  It is not reasonably probable that the jury would have returned a more favorable verdict on the marijuana possession charge if the court had not given the limiting instructions.  This was not a close case.  There was strong evidence proving that appellants possessed marijuana with the intent to sell.  Even if the alleged instructional error is assessed under the *Chapman* prejudice standard, as appellants urge, the alleged instructional error is still harmless.  (*Chapman, supra*, 386 U.S. at p. 24.)

## III.    The Trial Court Properly Refused To Instruct On Claim Of Right As A Defense To The Theft Charges.

### A.    Facts.

Parker argued that she was entitled to instruction on claim of right as an affirmative defense to the vehicle theft charges.  She requested CALCRIM No. 1863, which instructs on claim of right as a defense to theft or robbery pursuant to Penal Code section 511.  Parker also crafted two special jury instructions (special jury instruction Nos. 6 & 7).  Special jury instruction No. 6 provided:  "Those performing the work and furnishing the parts necessary for repair of an automobile may have a possessory lien thereon for the cost of repairs.  [(]Honey v. Pacific Auto. Indem. Exch. (1923) 190 Cal. 336, 212 P. 199.)"  Special jury instruction No. 7 quoted Civil Code section 3068, which pertains to service liens, in its entirety.  The only modification made to the statutory language was to omit subdivision and subsections indicators.

The prosecutor objected to all three instructions.  The trial court declined to instruct on claim of right because there was no evidence that Parker came into possession of the Camry under an express or implied contract with Hall to perform repairs on it.

---

**11**    This sentence provides:  "This information was not presented nor may be accepted by you to mean that just because a defendant possessed more than the quantity ... limitations in Health & Safety Code Section 11362.77 that a defendant is automatically guilty of the allegations in this case."

**B. The record does not contain substantial evidence supporting a claim of right defense.**

"A trial court must instruct the jury, even without a request, on all general principles of law that are '"closely and openly connected to the facts and that are necessary for the jury's understanding of the case." [Citation.] In addition, "a defendant has a right to an instruction that pinpoints the theory of the defense …."' [Citation.] The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.)

CALCRIM No. 1863 explains the claim of right defense. It provides, in part: "If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery). [¶] The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) openly took it. [¶] … The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith." (CALCRIM No. 1863.)

"[A] claim-of-right instruction need only be given if the defense is supported by the evidence. 'Whether or not a given set of facts provides the necessary support for drawing a particular inference is a question of law. Before instructing a jury that it may draw the inference, the trial court must determine that there is evidence on the record which, if believed, will support it. [Citation.] Giving an instruction implies there are factual questions to which the instruction relates. [Citation.]' [Citation.]" (*People v. Creath* (1995) 31 Cal.App.4th 312, 319.)

"'[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that appellant *acted* with a subjective belief he or she had a lawful claim on the property.' [Citation.] Whether or not the evidence provides the necessary support for drawing that particular inference is a question of law. [Citation.] Although

23.

a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is minimal and insubstantial. Doubts as to the sufficiency of the evidence should be resolved in the accused's favor. [Citations.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145 (*Barnett*).)

In *Barnett*, the California Supreme Court concluded that the court should not have instructed on claim of right because "when taken as a whole and viewed most favorably toward defendant," the evidence supporting this defense "was 'minimal and insubstantial.' [Citations.]" (*Barnett, supra*, at 17 Cal.4th at p. 1146.) The record did not contain "substantial evidence supporting the inference that defendant acted with the requisite bona fide belief" that the defendant was taking gold and money belonging to the victim "in satisfaction of a lawful claim to those items." (*Id*. at p. 1145.) Further, the claimed debt "was, by all accounts, uncertain and open to dispute." (*Id*. at p. 1146.)

Similar to *Barnett*, the record in this case does not contain substantial evidence supporting an inference that Parker believed in good faith that she had a right to the Camry when she took it. Hall testified that she repeatedly refused to give, trade or sell the car to Parker's husband, Bryant. Thus, Hall affirmatively demonstrated that she did not want to part with the Camry and, even though it was not operational, she was not abandoning it. Hall did not authorize Parker to arrange for the Camry to be repaired and removed from the property. Although Parker testified that she telephoned Hall several times and sent her a letter demanding she remove the car from the property, she did not testify that she notified Hall that Bryant was going to repair the Camry and expect payment from Hall. Parker did not testify that she notified Hall that she was going to drive the Camry after it was repaired. Finally, Parker did not produce any evidence that she had a right or responsibility to clear the Camry from her grandmother's property. Parker did not testify that her grandmother asked her to take steps to have the Camry removed from the property. Parker did not have any ownership interest in her

24.

grandmother's property. Thus, the record does not contain substantial evidence supporting the inference that Parker "acted with the requisite bona fide belief" that she had a right to remove the Camry from the property. (*Barnett, supra*, 17 Cal.4th at p. 1145.)

Parker's assertion that the facts in this case are similar to those considered in *People v. Russell* (2006) 144 Cal.App.4th 1415 is not persuasive. In *Russell*, the defendant took a motorcycle that he thought was abandoned. When he discovered that he was mistaken he tried to find its owner. (*Id*. at pp. 1420-1422.) In contrast, Parker knew that Hall owned the Camry. Hall repeatedly told Bryant that she did not want to part with it. Without notifying Hall in advance or obtaining Hall's permission, Parker arranged for Bryant to repair the Camry. Then Parker drove the vehicle. When Hall saw Parker driving the Camry in Taft, Parker sped away from her and drove the vehicle to Bakersfield. Lien proceedings were then instituted resulting in title of the Camry being conveyed to Bryant.

Since the record does not contain substantial evidence supporting a reasonable inference that Parker acted with a subjective belief that she had a lawful claim on the Camry, the trial court properly refused to instruct on the claim of right defense.

## IV. Bryant's Challenge To The Constitutionality Of Former Penal Code Section 12020 Was Forfeited.

Bryant argues his conviction for possessing a billy club must be reversed because former Penal Code section 12020 violates his federal constitutional right to bear arms in self-defense. Bryant acknowledges in his opening brief that he "did not challenge in the trial court the constitutionality of [former Penal Code] section 12020." No procedural principle is more familiar to reviewing courts than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to timely assert the right before a

25.

tribunal having jurisdiction to hear it. (*United States v. Olano* (1993) 507 U.S. 725, 731; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)

Bryant urges this court to exercise its discretion to consider the forfeited issue because the issue involves a pure question of law which is presented by undisputed facts. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [appellate court possesses discretion to consider a question that has not been preserved for review]; *In re Jenkins* (2010) 50 Cal.4th 1167, 1180 [new issue may be considered when it presents a pure question of law].) We decline to consider Bryant's constitutional challenge because the legal issue is intertwined with factual issues that were not explored at trial.

Bryant's trial testimony was factually inconsistent with his appellate position that former Penal Code section 12020 interferes with his constitutional right to bear arms in self-defense. Bryant testified that the billy club was police memorabilia that he inherited from his grandfather. He used it as an extension rod when painting (when the house was searched Bryant told a police officer that the billy club was a gift from his grandfather). Bryant testified at some length that, in his opinion, this item was not a weapon. He said, "It's just a stick" that is used "[t]o deter assailants or suspects that do have a weapon." Since Bryant unequivocally maintained at trial that the billy club was not a weapon, we agree with respondent that this "raises the question how can he therefore claim that the Second Amendment protects his possession of it." We also agree with respondent that if Bryant had raised the constitutional challenge at trial key factual issues necessary to resolution of the issue would have been more fully developed "such as whether a billy club is a weapon commonly used by ordinary citizens to defend themselves or whether it is primarily a weapon used by criminals." Therefore, we decline to exercise our discretion to consider the forfeited constitutional issue.

**V.    The Trial Court Did Not Abuse Its Discretion By Refusing To Reduce Bryant's And Parker's Wobbler Convictions To Misdemeanors.**

   **A.    Facts.**

Prior to sentencing, Parker filed a motion to reduce her vehicle theft and receiving stolen property convictions to misdemeanors based on several factors: (1) she was young and pregnant; (2) did not have a prior criminal record; (3) was employed; (4) was attending college and receiving good grades; (5) had community support; and (6) the crimes were unsophisticated.

Bryant filed a motion to reduce his weapon possession conviction to a misdemeanor based on the following factors:  (1) the crime was not sophisticated; (2) he did not inflict any injury and no victim suffered by his conduct; and (3) he did not take advantage of a position of trust.

The probation officer recommended that Parker and Bryant be placed on probation.

Appellants were sentenced on July 14, 2011.  After arguments by counsel the court stated that its "initial thought was to sentence each defendant to [the] low term 16 months."  It reconsidered this sentence in light of the probation officer's reports and the statements in mitigation.  The court sentenced each appellants to three years' probation with service of the first year of their probationary period in the Kern County Jail.  The trial court specifically noted that Bryant's prior convictions as an adult were numerous and that he successfully completed probation in three prior cases.[12]

The court denied Parker's and Bryant's motions to reduce the wobbler convictions to misdemeanors, stating:

---

[12]    Bryant was twice convicted for fighting in public and twice convicted for under age alcohol consumption in public.  In addition, he was convicted of drunk driving, speed exhibition and being drunk in public.

27.

"[With respect to Parker's theft convictions:] … The evidence did show ... that at some point when the victim pulled up behind ... Parker ... and yelled for [her] to stop so that she could retrieve her vehicle, Ms. Parker continued to drive away and in effect left that city and came to Bakersfield. There was no indication given Ms. Parker's behavior that she intended to give that vehicle back to the victim in the case. And as it was pointed out from the evidence, [Parker] took elaborate steps and elaborate measures to in fact sell that vehicle through a lien sale, to which the court believed she was not the proper lienholder to do so. [¶] Those are separate acts ... that the jury could and did use ostensibly to find her guilty of those crimes, and by reducing such to misdemeanor[s] in the court's view would belittle the jury's finding insofar as consideration given to Ms. Parker.

"[With respect to Bryant's weapon conviction:] ...[I]t does appear to the court that when [Bryant] testified as far as that weapon is concerned that he did his absolute best to represent that that in fact was not a weapon [and] ... was not used in the way, shape, or form of a weapon, and therefore would not agree that it is a weapon. Coupled with the fact that he knew he was not to possess it and yet he still continued to possess it, whether it be as an heirloom or whatnot or a remembrance for his grandfather, the mere fact was … by virtue of his felony status he was not to possess such a weapon.... [B]ecause he knew he shouldn't have possessed it and yet continued to possess such an item, I am not going to use my discretion to reduce it to a misdemeanor."

## B.     Discretion was not abused.

Parker and Bryant argue that the trial court abused its discretion by refusing to reduce their convictions to misdemeanors. We are not persuaded.

"Wobbler" offenses are those crimes that, in the discretion of the trial court, can be punished as either a felony or a misdemeanor. Possession of a billy club is a wobbler offense. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1187.) Vehicle theft and receiving stolen property are also wobbler offenses. (Veh. Code, § 10851, subd. (a); Pen. Code, § 496d, subd. (a).) Where a wobbler offense has been charged as a felony, Penal Code section 17, subdivision (b) vests the trial court with discretion to reduce the offense to a misdemeanor. "[A]ny exercise of that authority must be an intensely fact-bound inquiry taking all relevant factors, including the defendant's criminal past and public safety, into

due consideration." (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 981-982 (*Alvarez*).) "[S]ince all discretionary authority is contextual, those factors that direct similar sentencing decisions are relevant, including 'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidence by his behavior and demeanor at the trial.' [Citations.] When appropriate, judges should also consider the general objectives of sentencing such as those set forth in California Rules of Court, rule 410." (*Id*. at p. 978, fn. omitted.)

The trial court's ruling on a motion to reduce an offense to a misdemeanor is reviewed for an abuse of discretion. This is an "extremely deferential and restrained standard" of review. (*Alvarez, supra*, 14 Cal.4th at p. 981.) "'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.]" (*Id*. at pp. 977-978.)

Neither Parker nor Bryant has demonstrated that the trial court's decision constitutes an abuse of discretion. The record affirmatively shows that the trial court made individualized decisions based on the particular circumstances of the offenses and offenders. The fact that the trial court did not mention all of the factors discussed by Parker and Bryant in their appellate briefing does not establish an abuse of discretion because the trial court is presumed to have considered all relevant factors unless the record affirmatively shows otherwise. (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 836-837.) The trial court's careful consideration of all of the circumstances is demonstrated by its reconsideration of its initial intention to sentence appellants to prison. After careful consideration of the probation reports, the statements in mitigation and arguments of counsel the trial court ultimately decided to give

appellants' "an opportunity to be on probation." The trial court's decision not to extend further lenity by reducing the wobblers to misdemeanors fell well within its broad sentencing latitude. This decision was neither irrational nor arbitrary. Therefore, we uphold this ruling as a proper exercise of judicial discretion.

## DISPOSITION

The judgment is affirmed.

_____

LEVY, Acting P.J.

WE CONCUR:


_____

CORNELL, J.


_____

PEÑA, J.