Filed 7/5/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STEVE AHN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>STEWART TITLE GUARANTY COMPANY,<br><br>    Defendant and Respondent. | D080391<br><br><br><br>(Super. Ct. No. 37-2019-00014641-CU-WT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge. Affirmed.

Wingert Grebing Brubaker & Juskie, Stephen C. Grebing, and Camille E. Kollar for Plaintiff and Appellant.

Best Best & Krieger and Matthew L. Green for Defendant and Respondent.

Amidst a corporate merger, a sales executive is told there are limitations on how he can compete for the merging partner's clients. He loses sales commissions and is terminated for poor sales performance. Does he have standing to assert a cause of action under the Cartwright Act, California's antitrust statute? (Bus. & Prof. Code,[1] § 16700 et seq.) On the particular facts alleged in this case, the answer is clearly no.

Ahn was a sales executive for a title insurer who claims his sales figures were adversely affected when his employer barred him from using a particular sales pitch to solicit customers from a competitor who was also a proposed corporate merger partner. Ahn's pitch told prospective clients that after the proposed merger was finalized, they would have no choice but to comply with his company's higher-cost, less flexible underwriting standards. He attempted to use this pitch to convince these clients to abandon the competitor before the merger.

But a plaintiff suing under the Cartwright Act must suffer " 'antitrust injury,' " which in turn requires harm that "stem[s] from the anticompetitive aspect of [defendants'] alleged conduct." (*Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1235 (*Cellular Plus*).) Accepting Ahn's claim that the two merging entities agreed not to fully compete for each other's customers while their merger was pending, Ahn does not claim injury from the alleged anticompetitive aspects of this agreement, but rather from conduct that emphasized their competitive differences. A complaint that he could not lure customers with a pitch about their restricted postmerger options does not constitute an antitrust injury, meaning Ahn lacks standing to sue under the Cartwright Act. We find an alternative ground to affirm

[1] Further undesignated statutory references are to the Business and Professions Code.

based on Ahn's concession at oral argument that Fidelity and Stewart attempted to merge in good faith, and had the merger gone through, his Cartwright Act claim would be barred under *Asahi Kasei Pharma Corp. v. CoTherix, Inc.* (2012) 204 Cal.App.4th 1 (*Asahi*). The mere circumstance that the merger was not consummated is not enough to distinguish this case from *Asahi*.

Our conclusion that Ahn cannot demonstrate an antitrust violation affects his derivative economic relations tort claims, both of which require independently wrongful conduct. Concluding the trial court did not err in granting summary judgment, we therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Background and Claims Against Stewart*

Developers of wind, solar, and renewable energy projects must obtain title insurance securing the land and improvements used in a project in order to obtain financing for necessary infrastructure (wind turbines, solar panels, etc.).[2] Title insurance protects lenders and purchasers from defects in the property's title. Because these infrastructure projects are usually built on undeveloped rural land, a major aspect of obtaining title insurance involves getting waivers from owners of subsurface mineral rights. For many rural parcels, subsurface mineral rights were sold a long time ago to mining companies or oil and gas developers. Current landowners may be unsure if mineral rights were ever sold, who bought them, and who currently holds these interests. Once the current interest holders are identified and located, developers must obtain waivers, which is a difficult and time-consuming

---

[2]      We draw background facts from the operative complaint and its cross-referenced administrative complaint by the Federal Trade Commission (FTC) solely for context.

3

process. Thus, "title issues for these parcels can be highly complex and a title issue with even one parcel may impact the entire renewable energy project."

Four underwriters, known as the "Big 4," dominate the title insurance industry across the United States. Fidelity National Financial, Inc. (Fidelity) and Stewart Title Guaranty Company (Stewart) are two members of the Big 4 and horizontal competitors. In the renewable energy title insurance market, Stewart competed for business with Fidelity's wholly owned subsidiary, Chicago Title.

Ahn previously worked as a senior account executive at Stewart for fifteen years. In 2014, Chicago Title recruited him as their Vice President for Energy Services "for the specific purpose of competing with Stewart's title business in renewable energy." Ahn found it difficult to compete with Stewart given Fidelity's "more stringent underwriting policies concerning surface waivers from the holders of mineral rights." Fidelity generally required a developer to obtain waivers from 100 percent of the holders of subsurface mineral rights as a condition to providing title insurance, and rarely granted exceptions. Stewart, on the other hand, had looser underwriting standards and would provide insurance coverage so long as developers secured waivers from 51 percent or more of the mineral rights holders. These differences in underwriting standards offered "a significant competitive advantage to Stewart and made convincing clients to switch from Stewart to Fidelity very difficult." Few of Ahn's new clients at Chicago Title had moved over from Stewart.

In March 2018, Fidelity announced a tentative merger with Stewart, subject to shareholder and regulatory approval. Ahn would later allege that Fidelity and Stewart agreed during the premerger period not to compete for each other's clients and to allocate their customers. He believed he was fired

4

for attempting to actively compete with Stewart for clients during this premerger period. The specific sales pitch he sought to make, which compels our conclusion that he lacks antitrust standing, is discussed further below.

The merger ultimately did not go through. In September 2019, the FTC challenged it because the proposed merger would concentrate the Big 4 into three main players.[3] The FTC alleged this consolidation was "likely to result in anticompetitive harm." Beyond losing one of four competitors in the market, the FTC was concerned that Stewart, in particular, had "earned a reputation among market participants for being more creative and flexible in providing title insurance—to the benefit of its customers—and for selling title insurance at lower prices than the other Big 4 underwriters." More specifically,

> "Stewart has shown a greater willingness to undercut the other Big 4 underwriters on price, or offer more favorable coverage terms, in order to win business. Even within this four-firm 'oligopoly,' Fidelity has been forced to reduce its prices in response to Stewart. Stewart also finds creative ways to mitigate or assume risk in order to compete for business and has been willing to provide coverage where Fidelity and others in the Big 4 have declined to do so unless the customers can meet additional burdensome conditions. Where the current oligopoly has already softened competition, Stewart's approach has prompted others in the Big 4 to adjust their own competitive strategies to the benefit of customers."

In the FTC's view, neither Stewart nor Fidelity had demonstrated that the merger would yield efficiencies that would counteract anticipated competitive harm to consumers. Following the FTC's complaint, Fidelity and Stewart abandoned their merger attempt.

---

[3] Ahn was terminated in November 2018, ten months before the FTC filed an administrative complaint challenging the proposed merger.

Ahn sued his employer Chicago Title, its parent Fidelity, Fidelity's Executive Vice President Dan DuBois, and Stewart. He filed his operative First Amended Complaint after the FTC complaint. Only the claims against Stewart are relevant to this appeal. Ahn alleged that Stewart violated the Cartwright Act by conspiring with Fidelity and Chicago Title "to curtail and restrict competition between Fidelity/Chicago and Stewart in wind, solar and renewable energy projects." He asserted that the companies "agreed to allocate customers such that Fidelity would not compete for Stewart's customers" pending the merger. The purpose behind this arrangement, in Ahn's view, was to maintain Stewart's market share, earnings, and customer base while the merger was pending. He further accused Stewart of tortiously interfering with his contractual relations and interfering with his prospective economic advantage, with these tort causes of action resting on an alleged antitrust violation to show independently wrongful conduct.

In other words, Ahn's three causes of action against Stewart rose or fell on his antitrust claim. That claim, in turn, was predicated on efforts by Fidelity and Stewart to restrain Ahn's sales tactics as follows.

Soon after the merger was announced in 2018, Ahn was told by Joe Goodman, his supervisor at Chicago Title, that Stewart would likely have to conform postmerger to Fidelity's tighter underwriting guidelines—i.e., waivers would be required from all rather than half of subsurface mineral rights holders. Ahn saw this as an opportunity to compete for Stewart's customers. As he put it in the complaint: "If Stewart had to meet Chicago/Fidelity's more stringent underwriting standards, this would end Stewart's competitive advantage and open the door for Ahn to convince his old book of business (and other renewable developers) to choose Ahn, and therefore Chicago, over Stewart." Thus, in an attempt to lure Stewart clients

6

to Chicago, Ahn began telling them about the anticipated merger "and looming underwriting parity between Stewart and Chicago/Fidelity."

To Ahn's surprise, his active efforts to compete for clients with this pitch were met with internal hostility at Chicago Title. Ahn was told not to send public notices about the merger to Stewart's clients. With Goodman's approval, however, Ahn continued his outreach. As several large clients began to express interest in moving their projects from Stewart to Chicago Title, senior executives at both companies grew concerned. In a May 2018 e-mail exchange attached to the complaint, Dawn Anderson, a senior underwriter at Stewart, expressed concern that Ahn was telling a major wind farm client about impending postmerger underwriting shifts at Stewart. Because of Ahn's outreach to that client, Anderson wrote that her team risked losing a project they had spent months on. Anderson's e-mail made its way up the chain at Stewart and was passed onto Fidelity executives, who internally commented on "issues with Steve Ahn." DuBois told Goodman that Stewart's complaint about Ahn was "more than concerning," noting it would be a "big problem" if Ahn was still discussing the merger with Stewart's clients. Feeling he was in "[h]ot water" from Ahn's conduct, Goodman told Ahn to "stand down" and not mention the merger or anticipated underwriting changes to prospective clients.

Ahn alleged that these restrictions were designed to prevent him from competing with Stewart for clients, in furtherance of the companies' alleged premerger conspiracy. Had he been allowed to compete in the manner he desired, Ahn believed he would have brought several Stewart customers over to Chicago Title. Stewart's shareholders approved the merger in October 2018. Ahn circulated the associated press releases to prospective clients with Goodman's authorization. But six days later, he was abruptly terminated.

7

B.   *Summary Judgment Proceedings*[4]

Stewart moved for summary judgment.  (Code Civ. Proc., § 437c.)  As to the Cartwright Act, it argued Ahn lacked standing, citing *Vinci v. Waste Management, Inc.* (1995) 36 Cal.App.4th 1811 (*Vinci*) for the proposition that losing a job was not the type of injury the Act sought to rectify.  Stewart also maintained that Ahn could not prove any anticompetitive agreement between it and Fidelity.  Finally, Stewart asserted that the Cartwright Act claim failed on the merits because, under *Asahi, supra,* 204 Cal.App.4th 1, the Act did not cover premerger coordination.

As Stewart explained, Ahn's remaining economic tort causes of action required some type of independently wrongful act.  (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1142, 1148 (*Ixchel*).)  Because Ahn could not state an antitrust claim, Stewart contended these derivative tort claims likewise failed.  Moreover, Stewart claimed, those causes of action failed for lack of causation because Chicago Title terminated Ahn for legitimate performance-based reasons.

Opposing the motion, Ahn distinguished *Vinci* as a case where the plaintiff had not been terminated to further an anticompetitive scheme.  In Ahn's view, factual issues precluded summary judgment as to whether communications between Stewart and Fidelity executives suggested a premerger conspiracy to restrain competition.  Likewise, Ahn claimed factual issues existed as to whether Stewart tortiously interfered with his employment relationship.

The parties appeared before Judge Richard Whitney in March 2022.  Arguing against the tentative ruling in favor of Stewart, Ahn's counsel

---

[4]   Because this case ultimately turns on questions of law raised on summary judgment, we need not dwell on the parties' factual submissions.

claimed *Vinci, supra,* 36 Cal.App.4th 1811 applied the incorrect federal antitrust standard to reject standing whereas the Cartwright Act expressly allowed indirect market participants to sue.[5] As for the tort claims, Ahn contended that *Ixchel* required an independent wrong to prove tortious interference with contract in order to protect business competition. He claimed the requirement did not apply given Stewart's anticompetitive actions here.

The trial court rejected these arguments. Citing *Vinci, supra,* 36 Cal.App.4th 1811 determined that Ahn lacked standing because he had less incentive than Stewart's market competitors to vindicate the public's interest in antitrust enforcement. Even otherwise, the court concluded on the merits that the Cartwright Act applied to neither mergers nor premerger

---

[5]     In *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, the United States Supreme Court barred indirect purchasers from bringing federal antitrust damages claims. In response, the California Legislature amended section 16750, subdivision (a) to allow indirect purchaser claims under the Cartwright Act. (See *Union Carbide Corp. v. Superior Court* (1984) 36 Cal.3d 15, 20–22.) Since *Illinois Brick*, federal courts have developed a multifactor test for evaluating antitrust standing under the Sherman Act. (See *Associated General Contractors v. Cal. State Council of Carpenters* (1983) 459 U.S. 519, 537–544 (*AGC*).) These so-called "AGC factors" consider among other things whether there are more direct victims who can challenge the alleged antitrust violation. Despite the Cartwright Act's express extension to indirect purchasers, one intermediate appellate court applied the AGC factors to dismiss a case brought by a terminated plaintiff for lack of standing. (*Vinci, supra,* 36 Cal.App.4th at pp. 1814–1817.) After *Vinci* was decided, the California Supreme Court confirmed in *Aryeh v. Canon Business Solutions* (2013) 55 Cal. 4th 1185, 1195 (*Aryeh*) that federal antitrust standards "are at most instructive, not conclusive, when construing the Cartwright Act" given their distinct origins. Ahn argued below and on appeal that *Aryeh* and this court's standing analysis in *Cellular Plus, supra,* 14 Cal.App.4th 1224 undermine *Vinci*'s reasoning. For reasons we explain, we need not reach this question to resolve this appeal.

coordination, unless the merger was a sham to facilitate cartel behavior. Because Ahn had not provided evidence suggesting the proposed merger was a sham, the court concluded he lacked standing under *Asahi, supra,* 204 Cal.App.4th at page 16.  Turning to the tort claims, the court noted that they rested on a Cartwright Act violation for the requisite independently wrongful conduct.  Because Ahn could not assert a violation under the Cartwright Act, it reasoned he could likewise not raise a question of fact as to whether Stewart did anything independently wrongful.  Accordingly, it granted the motion for summary judgment and entered judgment for Stewart.

DISCUSSION

In evaluating Ahn's appeal on summary judgment, we focus largely on the issue of antitrust standing.  The trial court found that Ahn lacked standing because there were more direct claimants who could sue.  On de novo review (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*)), although we agree that Ahn lacks standing to sue under the Cartwright Act, we do so based on the separate antitrust injury requirement. (See *Securitas Security Services USA, Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 120 ["We will affirm an order granting summary judgment or summary adjudication if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons."].)

Ahn claims he was injured because he himself could not hinder competition with a sales pitch to lure Stewart customers to Chicago Title. Because this is not the type of injury the Cartwright Act seeks to protect, he lacks antitrust standing.  We further conclude Ahn's Cartwright Act cause of action fails on the merits given his concession at oral argument that his claim would be barred under *Asahi* had the merger between Fidelity and Stewart

gone through. Our conclusion that Ahn cannot state an antitrust claim prevents him from demonstrating a triable issue as to either of his derivative business tort claims, which require proof of an independently wrongful act. As a result, summary judgment was properly granted.

A.      *Standing under the Cartwright Act requires an antitrust injury.*

The Cartwright Act (§§ 16700–16770) is California's principal antitrust statute. It " 'generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices.' " (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1147.) The Act serves "overarching goals of maximizing effective deterrence of antitrust violations, enforcing the state's antitrust laws against those violations that do occur, and ensuring disgorgement of any ill-gotten proceeds." (*Clayworth v. Pfizer* (2010) 49 Cal.4th 758, 763–764.) Broadly speaking, the Cartwright Act is premised on the notion that competition yields efficient resource allocation, lower prices, higher quality, and greater social welfare. (*In re Cipro Cases I & II* (2015) 61 Cal.4th 116, 136 (*Cipro*).) "At its heart is a prohibition against agreements that prevent the growth of healthy, competitive markets for goods and services and the establishment of prices through market forces." (*Ibid.*)[6]

_____

[6]      The Sherman Act is the Cartwright Act's federal counterpart. "Sections 1 and 2 of the Sherman Act, 15 U.S.C. . . . are broadly worded statutes designed to counter restraints of trade and monopolistic practices; but are actionable by private individuals only through Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Section 4 of the Clayton Act allows private enforcement of the antitrust laws through a treble damages action by 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws[.]' 15 U.S.C. § 15." (*Re/Max Int'l v. Realty One, Inc.* (N.D.Ohio 1995) 900 F.Supp. 132, 145.)

11

The primary substantive provision of the Cartwright Act is found in section 16720, which prohibits a "trust," defined as "a combination of capital, skill, or acts by two or more persons" for such purposes as price-fixing, exclusive dealing, or restraints on trade or commerce or competition.  As it relates to Ahn's claims, "businesses may not engage in a horizontal allocation of markets, with would-be competitors dividing up territories or customers." (*Cipro, supra,* 61 Cal.4th at p. 148.)  Except as otherwise provided by statute, "every trust is unlawful, against public policy and void."  (§ 16726.)

Although framed in absolute language, "deciding antitrust illegality is not as simple as identifying whether a challenged agreement involves a restraint of trade." (*Cipro, supra,* 61 Cal.4th at pp. 145−146.)  Only unreasonable restraints of trade are prohibited, so the "rule of reason" generally asks whether the challenged conduct on balance promotes or suppresses competition.  (*Id.* at p. 146.)  Certain categories of agreements or practices are deemed per se illegal (*ibid.*), eliminating the need for elaborate market analysis to evaluate any anticompetitive effects.  (*Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 494 (*Marsh*).)  Ahn alleges a horizontal combination between Fidelity/Chicago Title and Stewart to allocate or avoid competing for clients, an arrangement that would be per se illegal.  (*Id.* at p. 493.)

The Cartwright Act has a distinct origin from the Sherman Act (*Aryeh, supra,* 55 Cal.4th at p. 1195), and there are notable differences between the two schemes.  Indirect purchasers lack standing under federal law, whereas the Cartwright Act expressly allows indirect purchasers to sue.  (See note 5, *ante.*)  Mergers are covered under federal antitrust law but not under the Cartwright Act.  (*State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1163 (*Texaco*).)  In addition, because the Cartwright Act contains no analogue to the antimonopoly provision found in section 2 of the Sherman Act, "single firm monopolization is not cognizable under the Cartwright Act." (*Asahi, supra,* 204 Cal.App.4th at p. 8.)

The essential elements of an antitrust claim under the Cartwright Act are an unlawful agreement, wrongful acts committed pursuant to it, and damages. (*Marsh, supra,* 200 Cal.App.4th at p. 493.) A proper plaintiff may sue to recover treble damages and injunctive relief. (§ 16750, subd. (a).) Section 16750, subdivision (a) confers standing on "any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant." A key component of analyzing antitrust standing is determining whether a plaintiff suffered an "antitrust injury."

The antitrust injury requirement derives from the United States Supreme Court decision in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.* (1977) 429 U.S. 477 (*Brunswick*). (See *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2011) 198 Cal.App.4th 1366, 1378 (*Flagship*).) The plaintiffs in *Brunswick* sued a defendant under the Sherman Act, alleging that it had acquired failing bowling alleys, thereby preserving competition in the market and depriving plaintiffs of the profits they otherwise stood to make had competition been reduced. (*Brunswick,* at p. 488.) The Supreme Court held that the plaintiffs lacked standing because they had not suffered an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." (*Id.* at p. 489.) California courts have since extended this requirement to the Cartwright Act, notwithstanding other differences between the two schemes.

(See *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 723 (*Kolling*); *Cellular Plus, supra,* 14 Cal.App.4th at p. 1234.[7])

The purpose of requiring antitrust injury is to "ensure[ ] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." (*Atlantic Richfield, supra,* 495 U.S. at p. 342.) Accordingly, "a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." (*Id.* at p. 344, italics added; accord *Flagship, supra,* 198 Cal.App.4th at pp. 1379−1380 ["an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects (as in *Brunswick*)"].) "If the injury flows from aspects of a defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's

---

7    Standing involves two separate inquiries in antitrust cases—first, whether a plaintiff suffered an *antitrust injury*, and second, whether that plaintiff is the *proper enforcer* to sue for antitrust violations. (*Todorov v. DCH Healthcare Authority* (11th Cir. 1991) 921 F.2d 1438, 1449 (*Todorov*).) *Cellular Plus* seems to have merged the two concepts together in suggesting that antitrust injury is broader under state law than federal law. (*Cellular Plus, supra,* 14 Cal.App.4th at p. 1234.) While the Cartwright Act indeed allows broader standing in a sense by letting indirect victims sue (see note 5, *ante*), the antitrust *injury* requirement remains the same across state and federal law. (See *Kolling, supra,* 137 Cal.App.3d at p. 723 [relying on *Brunswick* to define antitrust injury]; *Cellular Plus*, at p. 1234 [same, also relying on subsequent clarifying language in *Atlantic Richfield Co. v. USA Petroleum Co.* (1990) 495 U.S. 328, 340−341 (*Atlantic Richfield*)].) Although Ahn addressed antitrust injury in his briefs and cited relevant case authority, we issued a focus letter before oral argument directing the parties to comment on how Ahn's *specific* allegations comport with this standing requirement.

conduct is illegal." (*Theme Promotions, Inc. v. News Am. Mktg. FSI* (9th Cir. 2008) 546 F.3d 991, 1003.)

This court previously evaluated antitrust injury in *Cellular Plus, supra,* 14 Cal.App.4th 1224. In that case, two groups of plaintiffs sued licensed cell phone service providers (U.S. West and PacTel) over injuries caused by defendants' alleged price fixing scheme. Consumer-plaintiffs alleged that they paid too much for cellular service as a result of price fixing, whereas corporate sales agents alleged that price fixing resulted in artificially high prices, costing them sales. We concluded that both groups of plaintiffs had standing under the Cartwright Act. (*Id.* at pp. 1234–1235.) As to the sales agents, their alleged injuries were both "within the type section 16750 seeks to prevent and directly stem[med] from the 'anticompetitive aspect' of U.S. West's and PacTel's alleged conduct." (*Cellular Plus,* at p. 1235.)

Applying that standard, the question is whether Ahn's claimed injuries were (1) of a type the antitrust laws were designed to prevent, and (2) flowed from the anticompetitive nature of Stewart's conduct.

B.     *Ahn cannot show he suffered an antitrust injury.*

Examining the allegations in the operative complaint, we reach a different conclusion than in *Cellular Plus.* Here, the undisputed facts show Ahn did not suffer the requisite antitrust injury for Cartwright Act standing. For reasons we explain, he cannot show that his lost sales or termination stemmed from a competition-*reducing* aspect of Stewart's behavior. Instead, it was *Ahn* who attempted to profit from the competition-reducing market consolidation aspects of the proposed merger. Stewart may have prevented him from doing so, allegedly costing him sales and his job, but this harm did not amount to an antitrust injury.

15

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar, supra,* 25 Cal.4th at p. 843.) It necessarily follows that the pleadings frame the issues on a motion for summary judgment. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250 (*Conroy*).) "[T]he burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.) Thus, in seeking summary judgment on standing grounds, Stewart needed only to show that Ahn lacked an antitrust injury based on the theory of liability alleged in his complaint. In so doing, it could rely on the factual allegations in Ahn's complaint. (*Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324 [collecting cases].) Evaluating that question of law on de novo review, we conclude Ahn lacked standing to sue.

Ahn alleges that Fidelity and Stewart entered into a horizontal market allocation agreement not to actively compete for each other's clients. On its own, this suggests a market division, a per se violation of the Cartwright Act. (*Marsh, supra,* 200 Cal.App.4th at p. 493.) As the FTC complaint indicated, the title insurance market already reflected significant consolidation, with Stewart offering creative, flexible underwriting competition to Fidelity, benefiting customers with lower prices. Had Ahn sued because he was prevented from contacting Stewart customers altogether, this restraint would stem from the anticompetitive nature of the alleged market division. But this is not what Ahn alleged or what the evidence showed.

16

Instead, Ahn sued under a theory that he was precluded from luring Stewart customers with the pitch that the proposed merger with Fidelity would *reduce existing choice* in the market. He tried to convince Stewart's customers that postmerger, they would have to conform to Fidelity's more stringent underwriting requirements. In effect, Ahn was telling Stewart customers that the market was about to have only one underwriting choice— the more stringent standards and more expensive option of Fidelity—which would require waivers from all holders of subsurface mineral rights to underwrite the policy. Rather than risk a chance of not meeting those more stringent standards later, Ahn urged customers to preemptively switch to Chicago Title by anticipating the eventual loss of competitive choice. In so doing, Ahn pleaded his way out of being able to show the requisite antitrust injury.

"This is not the first time a plaintiff has tried to use the antitrust laws as a means to gain benefits based on anticompetitive conduct." (*Todorov, supra,* 921 F.2d at p. 1454.) Several federal cases support our conclusion that Ahn did not suffer an antitrust injury. The " 'central evil' " addressed by the antitrust laws is the elimination of competition that would otherwise exist. (*Am. Needle, Inc. v. National Football League* (2010) 560 U.S. 183, 195, quoting 7 P. Areeda & H. Hovenkamp, Antitrust Law (2d ed. 2003) P1462b, 193–194.) "[T]he Cartwright Act, like all antitrust laws, is about the protection of *competition*, not *competitors*." (*Asahi, supra,* 204 Cal.App.4th at p. 20, internal quotation marks omitted.) Where, as here, a plaintiff seeks to *join* rather than disrupt anticompetitive behavior, there is no antitrust injury.

For example, in *Top Agent Network, Inc. v. Nat'l Ass'n. of Realtors* (N.D.Cal. 2021) 554 F.Supp.3d 1024, a real estate agent network challenged a

17

trade association policy preventing it from marketing exclusive homes privately off the multiple listing service (MLS). (*Id.* at pp. 1026–1027, 1029.) While the complaint plausibly alleged that the association's policy had anticompetitive effects in limiting competition for off-MLS sales, the network had "failed to state an antitrust injury because its alleged harm—the loss of agent members—does not flow from effects of the Policy that are harmful to competition." (*Id.* at p. 1032.) Instead, the network itself sought to profit off an anticompetitive business model that decreased competition for exclusive listings. (*Id.* at pp. 1032–1033.) As the court explained, "one of the virtues of the antitrust standing analysis is that it prevents such a plaintiff from deploying antitrust law as a shield for its own anticompetitive injuries." (*Id.* at pp. 1034–1035.)

A similar result was reached in *Local Beauty Supply, Inc. v. Lamaur, Inc.* (7th Cir. 1986) 787 F.2d 1197. Local, a distributor of beauty supply products, was terminated by a manufacturer named Lamaur after other distributors complained about Local's sales practices. Accepting Local's premise that alleged price-fixing between Lamaur and other distributors violated antitrust laws, the court held that Local could nevertheless not demonstrate antitrust injury. (*Id.* at pp. 1200–1202.) Citing *Brunswick, supra,* at page 488, it reasoned that Local did not suffer antitrust injury because its damages did not " 'flow from that which makes the defendants' acts unlawful.' " Instead, Local was damaged by its "inability to continue to profit from the anticompetitive nature of the violation"—Local's interests were in fact "disserved by enhanced competition." (*Local,* at pp. 1202–1203.) As the court concluded, "lost profits from the inability to continue to take advantage of inflated prices due to antitrust conduct are not representative of antitrust injuries . . . ." (*Id.* at p. 1203; see also *Jack Walters & Sons Corp. v.*

18

*Morton Bldg., Inc.* (7th Cir. 1984) 737 F.2d 698, 708 ["[a plaintiff] will not be heard to complain about having to meet lawful price competition, which antitrust law seeks to encourage, merely because the competition may have been enabled by an antitrust violation"].)[8]

Drawing from these authorities, we conclude that Ahn cannot show he suffered an antitrust injury as required to sue under the Cartwright Act. While he points to the FTC complaint to suggest the proposed merger between Fidelity and Stewart was anticompetitive, that is not the source of his injury. He does not claim that he was barred from contacting Stewart customers altogether as a result of a horizontal market allocation agreement between Stewart and Fidelity. Instead, he claims Stewart blocked him from using a particular sales pitch. Ahn tried to convince Stewart clients to switch to Fidelity by claiming that they would no longer have a choice postmerger to pick Stewart's more flexible underwriting standards and lower costs. Ahn may well have lost sales and been fired as a result, but this claimed injury

---

[8] Other cases are similar. In *Daniel v. Am. Bd. of Emergency Med.* (2d Cir. 2005) 428 F.3d 408, doctors challenged a certifying board's control over emergency room doctors. Even if the plaintiffs plausibly alleged supply constraints, they could not show antitrust injury where the harm alleged was denial of the opportunity to command the same super-competitive pay earned by their certified colleagues. (*Id.* at pp. 438–439.) As the court reasoned, "plaintiffs cannot themselves state an antitrust injury when their purpose is to join the cartel rather than disband it." (*Id.* at p. 440; see also *Sanjuan v. American Bd. of Psychiatry and Neurology* (7th Cir. 1994) 40 F.3d 247, 251.)

19

flows from *Ahn's attempt to profit from the anticompetitive effects of the proposed merger,* and not from conduct the Cartwright Act seeks to protect.[9]

Ahn likens this case to *Kolling, supra,* 137 Cal.App.3d at page 724, where the loss of a newspaper distributorship due to a publisher's price-fixing scheme was the type of injury the Cartwright Act meant to prevent. He also draws comparisons to *Cellular Plus*, *supra,* 14 Cal.App.4th at page 1235, where lost sales by sales agents affected by an alleged price-fixing scheme by two cellular service companies sufficed to show antitrust injury. In his view, losing his book of business was *also* the type of injury the antitrust laws cover. The problem for Ahn is that these comparisons run only skin-deep. On closer examination, neither the newspaper distributor in *Kolling* nor the cell phone sales agents in *Cellular Plus* were trying to profit from *anticompetitive effects* of the defendant's conduct. These cases are distinguishable and do not change our conclusion that Ahn's theory of the case is inconsistent with his having suffered an antitrust injury.[10]

---

[9] Pressed at oral argument to explain how consumers were harmed when Ahn was barred from making his pitch, counsel suggested that Stewart customers might face project disruptions with midstream postmerger underwriting changes. But project disruption is not the same thing as antitrust injury. Ahn admits he sought to convert Stewart clients to a more expensive, less flexible underwriting option by suggesting the market would soon offer less consumer choice. This is not the type of harm the antitrust laws protect against.

[10] Much of the parties' arguments before the trial court and on appeal centered on the merits of *Vinci, supra,* 36 Cal.App.4th 1811, and whether a loss of employment could support a claim under the Cartwright Act. In concluding Ahn lacks standing because he cannot show an antitrust injury, we express no view on these matters.

20

C.     *Ahn's Cartwright Act claim fails on the merits.*

The trial court concluded that the Cartwright Act did not apply to the premerger activity challenged in this case. In its landmark *Texaco* decision, the California Supreme Court concluded that unlike the Sherman Act, the Cartwright Act applies only to entities that combine and *perdure*—i.e., "continue as separate, independent competing entities during and after the collusive action." (*Texaco, supra,* 46 Cal.3d at p. 1163.) It thus does not "regulate the bona fide purchase and sale of one firm by another." (*Ibid.*) This rationale was extended to specified *premerger* activities in *Asahi, supra,* 204 Cal.App.4th 1.

Japanese pharmaceutical company Asahi sued California-based CoTherix for halting marketing or development of Asahi's licensed hypertension drug upon CoTherix's acquisition by competing pharmaceutical company Actelion. Asahi challenged the company's premerger activity under the Cartwright Act. The court rejected that claim by extending the reasoning of *Texaco.* Although Asahi disclaimed any challenge to the merger itself, the court found it "difficult to see how our antitrust policies are furthered by saying that parties may not, in the process of merging, reach agreement to do that which the combined entity may freely do." (*Asahi, supra,* 204 Cal.App.4th at p. 18.) Even before a merger formally closes, "independent economic decisionmaking is compromised, even if not eliminated, once companies have formally agreed to merge." (*Id.* at p. 17.) Consequently, it was difficult to see how premerger conduct incident to an otherwise valid merger agreement could violate the Cartwright Act. (*Id.* at pp. 17–18.)

*Asahi* stands for the proposition that because the Cartwright Act does not cover merger activity, it also does not extend to premerger activity that is incidental to an otherwise valid merger agreement. Ostensibly, this holding

21

leaves open the possibility of a Cartwright Act claim based on premerger conduct that is *not* incidental to a good faith agreement to merge. Finding no evidence of this scenario, the trial court rejected Ahn's Cartwright Act claim on the merits. While *Texaco* and *Asahi* "do not address the exact circumstances in this case, where a merger was not actually completed," Ahn had provided no evidence "of sham merger negotiations or cartel behavior." In the absence of this scenario, the court concluded "the Cartwright Act does not apply to pre-merger activity where a merger agreement was in place." As the court explained, "the Cartwright Act is not furthered where the entities fully intended to merge and they could have behaved as they did if the merger had been completed."[11]

Challenging this result, Ahn sought to distinguish *Asahi* on factual grounds in his briefs. Because Fidelity and Stewart never merged, they remained separate independent entities before and after the alleged collusive behavior. Ahn noted that the proposed merger in *Asahi* had not been challenged as unlawful.[12] Whereas *Asahi* presumed that the companies were acting in the economic interest of the postmerger entity, Ahn claimed that Stewart's actions "were motivated by the need to preserve the individual interests of the company, not to further the merger." In Ahn's view, Stewart

---

[11] Reaching the same conclusion on the summary judgment motion filed by Fidelity and Chicago Title, the court observed that the merger agreement "contemplated restricting Stewart's freedom to make independent business decisions" and "essentially deprived the marketplace of an independent decisionmaker." In the court's view, "the only real difference between this case and *Asahi* is the fact that the merger was not completed."

[12] CoTherix submitted evidence that neither the United States Department of Justice nor the FTC "challenged the acquisition as anticompetitive," and Asahi disclaimed any challenge to the merger's validity. (*Asahi, supra,* 204 Cal.App.4th at p. 17, fn. 18.)

"was making business decisions to maintain a future independent corporation." Finally, Ahn suggested that because the merger was not approved by shareholders for several months after it was announced, fact questions remained as to whether the challenged conduct even occurred during the "pre-merger" phase. In its respondent's brief, Stewart claimed Ahn's efforts to distinguish *Asahi* were "unavailing" where Stewart and Fidelity intended in good faith to merge and worked together after the merger agreement was signed to advance the interests of the postmerger entity.

At oral argument, Ahn substantially clarified his position. Agreeing that the proposed merger between Stewart and Fidelity was contemplated in good faith, counsel conceded that he was not claiming the proposed merger was a sham. Counsel further agreed that had the merger been consummated, Ahn's *specific claim* regarding collusive premerger activity between Stewart and Fidelity would be barred under *Asahi*. He confirmed that the sole basis on which he distinguished *Asahi* was on the ground that the merger here did not ultimately go through. In response, Stewart's counsel stated that the framework proposed by Ahn would inject too much uncertainty into corporate affairs. It would chill routine premerger activity with companies left unsure whether actions taken in good faith would ultimately be deemed legal or illegal under the Cartwright Act.

Accepting his counsel's concession, we must reject Ahn's Cartwright Act claim on the merits. Under *Asahi*, where two companies plan to merge in good faith, premerger activity incidental to that agreement to merge is not actionable under the Cartwright Act. We find no principled way to cabin *Asahi* to a scenario where a good faith merger is ultimately consummated. A merger might fall through for any number of reasons, and we agree with

23

Stewart that a rule that looks to whether a merger ultimately closed injects uncertainty that is unmoored from the logic underlying *Asahi*. Accordingly, separate and apart from Ahn's lack of standing, his Cartwright Act claim fails on the merits.

D.     *Ahn's derivative tort claims fail for lack of an independent wrong.*

Turning to the tort claims, the trial court relied on *Ixchel, supra,* 9 Cal.5th 1130 to conclude that Ahn's causes of action against Stewart for tortious interference with contract and tortious interference with prospective economic advantage required an independently wrongful act. Because it found Ahn lacked standing to sue Stewart under the Cartwright Act, the court concluded he could not establish this essential requirement for tort liability. Ahn contests this finding. He distinguishes *Ixchel* as a case concerned with protecting legitimate competition and argues a different standard should apply here where competition was hindered by collusive behavior. We are not persuaded.

Tortious interference with prospective economic advantage has long required proof of an independently wrongful act apart from the interference itself. (*Ixchel, supra,* 9 Cal.5th at p. 1142.) Tortious interference with contract, on the other hand, typically does not have that requirement. (*Id.* at p. 1141, citing *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.) Because interference with an at-will employment agreement is akin to interference with a prospective economic relationship, the Supreme Court recently held that both torts require proof of an independently wrongful act. (*Ixchel*, at pp. 1147–1148.) Accordingly, where a plaintiff alleges tortious interference with an at-will employment contract by a third party, as Ahn does here, he must prove that the defendant's conduct was independently wrongful. (*Id.* at p. 1148.)

24

Because the pleadings frame the issues on summary judgment (*Conroy, supra,* 45 Cal.4th at p. 1250), we revisit the First Amended Complaint. Both tort claims challenge Stewart's actions in contacting Fidelity management to halt Ahn's sales practices, which in turn allegedly caused Ahn to lose sales and be fired. Ahn asserted that Stewart's interference was "illegal and wrongful" under the Cartwright Act.[13] As framed in the complaint, these tort claims therefore rest on an antitrust violation to show independently wrongful conduct. With Ahn unable to show an antitrust injury, the trial court correctly ruled that he likewise could not demonstrate a triable issue on either economic tort claim.

As Ahn suggests, *Ixchel*'s result is driven in part by concerns about chilling legitimate competition. (*Ixchel, supra,* 9 Cal.5th at p. 1148 ["Allowing disappointed competitors to state claims for interference with at-will contracts without alleging independently wrongful conduct may expose routine and legitimate business competition to litigation."].) But this does not help him. Ahn seems to suggest that Stewart's actions served "no legitimate business purpose" other than to punish him. Yet he acknowledges Stewart's procompetitive fear that it would lose customers due to Ahn's sales tactics. Under Ahn's reading of *Ixchel*, a market player could never confront a competitor about questionable sales tactics by the competitor's agents without facing exposure to costly litigation for tortious interference with contractual relations. (See *Coast Hematology-Oncology Associates Medical Group, Inc. v. Long Beach Memorial Medical Center* (2020) 58 Cal.App.5th 748, 767 [courts are wary of imposing tort liability on economic rivals "based

---

13    This allegation was made solely as to the tortious interference with prospective economic relations claim, as tortious interference with an at-will employment contract did not at the time require independently wrongful conduct. *Ixchel* was decided after the First Amended Complaint was filed.

25

on conduct regarded by the commercial world as both commonplace and appropriate"].)  These are precisely the chilling effects to normal business operations that *Ixchel* sought to avoid by requiring independently wrongful conduct in the at-will employment context.  While Ahn may prefer a different result, we reject his contention that the facts of this case place it "outside the *Ixchel* court's reasoning."

## DISPOSITION

The judgment is affirmed.  Stewart is entitled to its costs on appeal.

DATO, Acting P. J.

WE CONCUR:

DO, J.

BUCHANAN, J.

26